ALASKA NATIONAL BANK OF THE
NORTH, Appellant,

v.

GWITCHYAA ZHEE CORPORATION,
Appellee.

ALASKA NATIONAL BANK OF THE
NORTH, Appellant,

v.

TOGHOTTHELE CORPORATION,
Appellee.

Nos. 4493, 5360.

Supreme Court of Alaska.

Aug. 28, 1981.

Stephan H. Williams, Charles E. Cole, Law Offices of Charles E. Cole, Fairbanks, for appellant.

Dennis M. Mestas, Mestas & Schneider, Anchorage, for appellee Gwitchyaa Zhee Corp.

James T. Robinson, Teresa A. Hogan, Groh, Eggers, Robinson, Price & Johnson, Anchorage, for appellee Toghotthele Corp.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and ROWLAND,* Superior Court Judge.

## OPINION

BURKE, Justice.

This case calls upon us to review summary judgment decisions rendered in favor of Gwitchyaa Zhee and Toghotthele Corporations holding void and unenforceable purported security interests held by Alaska National Bank of the North (ANB or Bank) in certain funds on deposit with the Bank.

## FACTS

Gwitchyaa Zhee and Toghotthele are village corporations organized pursuant to the provisions of the Alaska Native Claims Settlement Act, 43 U.S.C. § 1601 *et seq.* See 43 U.S.C. §§ 1602(j), 1607. Under the Act, the villages are subject to certain controls by their regional corporations, in this case Doyon, Ltd. Doyon received funds from the federal government for ultimate distribution to the villages. Under § 1606(*l*) of the Act, the regional corporation may withhold village funds until the village corporation submits a satisfactory plan for the use of the money. In 1973 Doyon deposited the funds it received with ANB under a "Trust Agreement," and later designated subaccounts on behalf of each of the village corporations entitled to receive these funds.

In late 1975, Gwitchyaa Zhee and Toghotthele were approached by representatives of a private entity, the Dena' Hena' Henash Development Corporation (known as DNH) to assist that company with funds necessary for it to undertake a construction contract. The contract was with the federal govern-

* Rowland, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

ment's Small Business Administration (SBA) for the construction of Coast Guard housing at Tok, Alaska. In order to obtain the contract, DNH was required to post payment and performance bonds in excess of $750,000. Unable to obtain these bonds from conventional sources, it offered the village corporations a share of the expected profits from the venture in exchange for their agreement to put up the necessary funds.

Gwitchyaa Zhee and Toghotthele agreed, and the boards of directors of both corporations passed resolutions to this effect. The proposed investment was then submitted to Doyon for approval and it passed resolutions authorizing Gwitchyaa Zhee to assume sixty percent of the bond liability, and Toghotthele twenty percent.[1]

In actuality, the plan was to use an irrevocable letter of credit instead of a bond to meet the government's requirements, a procedure DNH and the Bank had used before. Doyon informed the Bank of the approval and instructed the Bank to assign to itself sufficient trust account funds to cover the letter of credit to be issued by the Bank.

The parties thereupon entered into several agreements to formalize the transaction. Gwitchyaa Zhee and Toghotthele agreed to accept a share of DNH's expected profits in exchange for the provision of funds. The agreements required both village corporations to deposit the required sums with ANB "for the purpose of meeting the bonding requirements."

DNH agreed with the Bank to obtain the necessary documents from Gwitchyaa Zhee and Toghotthele, whereupon the Bank would issue the letter of credit. Gwitchyaa Zhee and Toghotthele each executed three documents prepared by ANB: (1) an "Assignment of Funds Received Pursuant to Alaska Native Claims Settlement Act" (naming the trust account established by Doyon) (2) a "Continuing Guaranty," and (3) an "Authority to Hypothecate." In es-

sence, the corporations agreed to be responsible for all of DNH's debts to the Bank, whether arising before or after the date of the agreement. A copy of the executed documents was mailed to Doyon. The Bank issued the letter of credit, and the project went forward.

The Bank was also serving as construction lender to DNH on the project. It had previously approved a line of credit secured by an assignment of the contract proceeds for DNH to draw on. ANB had worked with DNH in the past, and at the time of these transactions DNH owed it approximately $43,000 as the outstanding balance on a 1973 loan guaranteed by the SBA.

By late 1976 it became apparent to the parties that DNH was having difficulty with the project. Toghotthele's president hired a consultant with experience in the construction industry to advise him of the status of the project. On January 7, 1977, ANB wrote to DNH, Gwitchyaa Zhee and Toghotthele of its concern about the "substantial cash flow deficit." The letter set out DNH's financial position and noted the possible liability of Gwitchyaa Zhee and Toghotthele for any losses if the letter of credit was called upon by the SBA. The letter concluded by asking those involved to come to a meeting at the Bank the following week.

The meeting was held on January 13, and the Bank then drafted a letter reflecting the discussion. The letter stated that the Bank's representative

explained that DNH requires approximately $130,000 to complete the project. DNH has exhausted its Line of Credit at the bank. The bank, acting as surety under the payment bond given by DNH to the SBA, is now faced with the prospect of paying DNH's unpaid obligations on the project. Since Gwitchyaa Zhee Corporation and Toghotthele Corporation have indemnified the bank under its payment bond ... the bank wanted the vil-

---

1. Another company agreed to assume the remaining 20 percent of the bond liability, but its liability was secondary. When it became apparent that the losses on the contract would not exceed the amounts pledged by Gwitchyaa Zhee and Toghotthele, the third company was released from its obligation with the consent of the parties.

lage corporations to be aware of the possibility that they may be called upon to indemnify the bank and to obtain their advice with respect to the steps which the bank should take at this time to assure completion of the project by DNH and the payments of its obligations on the project.

The Bank also told the participants that it had loaned $230,000 to DNH under the line of credit, for which the corporations were liable under the continuing guarantees.

In response, the presidents of Gwitchyaa Zhee and Toghotthele "agreed that for a number of reasons it was best to avoid having the SBA call upon the bank to fulfill its obligations under the Irrevocable Letters of Credit given the SBA as a payment bond." It was therefore decided that the Bank would loan an additional $130,000 to DNH, with the understanding that Gwitchyaa Zhee and Toghotthele "guarantee advances under this note under the existing continuing guarantee agreements and assignment of funds ... agreements." Toghotthele's board of directors ratified the action taken at the January 13 meeting, but Gwitchyaa Zhee's president forgot to bring up the matter at that corporation's subsequent meeting and no action was taken by the board. The Bank set up a controlled disbursement account for the new line of credit and apparently obtained the concurrence of the SBA to its actions.

One month later, the Bank again wrote to the participants in the project and informed them that it now appeared that DNH would need more than originally anticipated to finish the job. The letter gave a detailed breakdown of estimated income and expenses and concluded that another $100,000 would be required. Another meeting was held, at which the "participants requested the Alaska National Bank to extend an additional note in the amount of $100,000,"

and the Bank "agreed to do so under the same terms and conditions and understanding" as in the previous meeting.

Using the additional money loaned by the Bank, DNH completed the project and the SBA released the letters of credit without making a claim under them. The Bank then demanded payment from DNH for the amount due on the loans to it, but DNH was without funds to meet that demand. The Bank has therefore sought to foreclose upon its purported security interest in the trust account funds used to secure the letter of credit.

The litigation concerning the Bank's claim against Gwitchyaa Zhee began as an interpleader action filed by Doyon seeking a determination as to which of the competing claimants was entitled to the trust account monies. ANB counterclaimed to assert its security interest, and Gwitchyaa Zhee moved for summary judgment on the ground that the security interest was invalid as a matter of law. ANB also sought summary judgment.

The litigation involving Toghotthele began with Toghotthele's complaint naming Doyon and ANB as defendants, and asserting that both breached trust duties owed to Toghotthele. The Bank answered and again counterclaimed to foreclose on its security interest. Both parties then moved for summary judgment.

The trial court granted partial summary judgment against ANB in both cases because it found that the Bank was seeking indemnification from the corporations for loans that were not within the intent of Doyon's authorization. Costs and attorney's fees were awarded to Gwitchyaa Zhee and Toghotthele. Following the Bank's appeals the cases were consolidated in this court.[2] We reverse.

2. In the Toghotthele case, the lower court made a determination pursuant to Civil Rule 54(b) that a final judgment should be entered, and the Bank's appeal is therefore properly before the court. However, no such determination was made in the Gwitchyaa Zhee case and the appeal is therefore improper. Because the two

cases present essentially identical facts and legal questions, we treat the purported appeal as a petition for review, and we grant that petition because we find that the case meets the requirements of Appellate Rule 402(b)(2). *See Hagberg v. Alaska Nat'l Bank,* 585 P.2d 559, 560 (1978).

## DISCUSSION

The Bank presents two main arguments on appeal. It contends that its role as a surety for DNH allowed it to make loans to DNH to prevent the government from declaring the project in default and calling upon the letter of credit. The Bank says its actions as a surety were guaranteed by the documents signed by Gwitchyaa Zhee and Toghotthele, and it seeks indemnification for the loans from Gwitchyaa Zhee and Toghotthele by foreclosure of the security interest in the trust account. Alternatively, the Bank questions the lower court's decisions that ANB and the village corporations were in a trustee-beneficiary relationship, and that it breached its duty as a trustee. Because we conclude that the loans made by the Bank were not within the scope of the purported trust relationship, but were instead part of the Bank's powers under the surety and indemnity arrangement made by the parties and authorized by Doyon, we do not reach the question of whether a trustee-beneficiary relationship existed.

As described above, Gwitchyaa Zhee and Toghotthele understood at the time of these transactions that they were committing the funds in the ANB trust account as security for the letter of credit. They admit, and there can be no question, that the documents executed by their officers obligate the corporations for any loans made to DNH. However, they contend that the documents should not be enforced against them because they encumber the trust account funds for purposes beyond that of securing the letter of credit. The corporations rely on the fact that Doyon only authorized encumbering the trust account for the purpose of providing bonding for the project and not for guaranteeing all of DNH's obligations.

While we might therefore have doubts about holding the corporations liable for all of DNH's debts to the Bank, we find here that the Bank is only seeking indemnification for money loaned in its role as a surety. We reach this result by first recognizing and then differentiating between the Bank's three roles in the transactions at issue here. ANB acted as the trustee or agent for Doyon and the village corporations, as construction lender to DNH, and as a surety for DNH. Gwitchyaa Zhee and Toghotthele agreed to guarantee the obligation for which the Bank was a surety. Banks do not commonly act as sureties,[3] and the Bank's unfamiliarity with this role probably led it to utilize documents that may not have been well suited to the problems involved. Further, the same entity does not normally act as construction lender and as surety. Thus, when the decision was made to loan additional money to DNH, it was less than perfectly clear that the loan was made by the Bank as surety and not as construction lender.

Before turning to the question of whether the loans made to DNH in January and February 1977 were made by the Bank as surety, it is necessary to determine whether ANB seeks indemnification for any other loans made to DNH. If the Bank seeks recovery of either the 1973 loan or the advances under the line of credit then it is apparent that it cannot rely on its role as surety for indemnification but must ask us to uphold the documents executed by the corporations as a valid guarantee of all of DNH's debts.

With respect to the 1973 loan, the Bank has disclaimed any intention to hold the corporations liable for the amount still owed to it, but has instead enforced the SBA's guarantee of the obligation. As to the original line of credit advanced to DNH,

---

**3.** The common law rule is that a bank may not act as a surety. Note, *Guaranty Letters of Credit: Problems and Possibilities*, 16 Ariz.L. Rev. 822, 831–35 (1974). However, federal regulations now apparently allow this role. 12 C.F.R. § 7.7010(a) ("A national bank may ... bind itself as a surety to indemnify another ... if it has ... a segregated deposit sufficient in amount to cover the bank's total potential liability ...."). As discussed below, there normally are significant differences between the suretyship resulting from a guaranty letter of credit, as provided by the bank here, and that commonly undertaken by corporate sureties or insurance companies.

the record seems to indicate that these loans were repaid from contract proceeds assigned by DNH to the Bank. When the project ran into financial trouble late in 1976, the problems were not due to the inability of DNH to repay the Bank, but instead derived from the fact that DNH's expenses exceeded the contract price, and DNH's resulting inability to pay its subcontractors and material suppliers and proceed to completion. We can thus conclude that it is only the final extensions of credit to DNH that are at issue.

We therefore turn to the question of whether these loans were made by the Bank as surety, and thus within the plain intent of the guarantee authorized by Doyon and made by Gwitchyaa Zhee and Toghotthele. The Bank argues that as the surety for the project it was empowered to extend loans to DNH if it believed in good faith that this was the best way to avoid having the SBA declare DNH in default on the project and call the letters of credit. The Bank contends that interpretation of the documents executed by the corporations as indemnifying it for these loans is in accord with equitable principles of suretyship.

■ In considering these arguments, we first note that the parties assigned the Bank a broader role than that usually accompanying the issuer of a letter of credit. A bank normally need not monitor the underlying contract for which the letter of credit was issued, but need only determine whether the documents presented by the party calling upon the letter are sufficient according to the letter's terms. *Insurance Co. of North America v. Heritage Bank,* 595 F.2d 171, 173 (3d Cir. 1979); *Bank of North Carolina, N.A. v. Rock Island Bank,* 570 F.2d 202, 206 n.7 (7th Cir. 1978); *First Empire Bank v. Federal Deposit Insurance Corp.,* 572 F.2d 1361, 1366–67 (9th Cir. 1978); J. White & R. Summers, *The Law*

*Under the Uniform Commercial Code* § 18–2, at 713 (2d ed. 1980); Note, *Guaranty Letters of Credit, supra* note 3, at 829.[4] Here, however, the Bank purported to act as a surety, the parties accepted that role at the time of the additioral loans, and on appeal they have not questioned its ability to do so. In this context, we too consider the Bank to have those powers normally exercised by a surety, and turn to the question of whether they apply in the situation here.

The situation facing the parties in January 1977 was one of some desperation. DNH had apparently already overdrawn its account by over $20,000, and lacked funds to pay suppliers and workers. The SBA had not declared the project in default, but there is little question but that such a declaration would have come immediately if no infusion of cash was made.

■ In this situation, the commentators suggest that the surety's first inquiry is into the contractor's financial position. Fields, *A Lost Week End,* 29 Ins.Coun.J. 587 (1962). Here, the Bank made such an inquiry and possessed detailed information about the project's finances. After analyzing this information the surety has a choice between allowing the contractor to go into formal default, and preventing default by financing the project to completion. *Id.* at 589–90; Shereff, *Some Practical Problems of the Surety Under a Construction Contract Bond Agreement of Indemnity Before Declaration of Default by the Owner,* 32 Ins.Coun.J. 130 (1965).

■ The key inquiry, assuming that the contractor is honest and capable, is whether the contractor can be financed for less than the amount of the bond, and for less than it would cost to bring in another contractor. Fields, *supra,* at 589; Shereff, *supra,* at 131–32. This answer generally depends on

4. The commentator states:
  [A] guaranty letter of credit might be drawn on—because of either actual default or an honest dispute—even though a contract had been substantially completed. While no corporate surety would pay or perform beyond

  the extent needed for completion, the letter of credit bank must pay the face amount of the credit when the operative documents are presented.
  *Id.* at 830.

the amount of work remaining to be done, for if the project is almost complete then it presumably will cost less than the amount of the bond to complete it, and it would cost far more to give the contract to another contractor. *Id.* In this instance, the project was in the final stages of completion, and those present at the meeting called by the Bank to discuss the situation agreed it was best to finance DNH rather than allow a formal default to be declared.

From the government's perspective, it seeks to avoid default unless all other measures have failed. Symposium, *Rights and Obligations of the Surety Upon a Miller Act Bond Default,* 36 Ins.Coun.J. 545, 551 (1969). It therefore recognizes the surety's right to "assist the contractor by financing payments to subcontractors, advancing funds to meet payrolls or bills for necessary materials, or . . . even bring in a new subcontractor to complete the work in the contractor's name." *Id.* at 552.

▮ The courts have recognized the surety's position by refusing to make a formal declaration of default determinative of the legal obligations of the parties. Instead, a default is found where the contractor is "financially unable to perform" its contract. *Fischer Construction Co. v. Fireman's Fund Insurance Co.,* 420 F.2d 271, 276 (10th Cir. 1969).[5] Where this occurs, a surety is acting in accord with its legal obligation under the bonds in assisting the contractor, and is not a volunteer who should not be entitled to compensation. *Indemnity Insurance Co. v. Lane Contracting Corp.,* 227 F.Supp. 143, 148 (D.Neb.1964); *Lacy v. Maryland Casualty Co.,* 32 F.2d 48, 53 (4th Cir. 1929).

In accord with this authority, we reject Toghotthele's arguments that indemnity is proper only where the government actually executes on the bond or letter of credit and that absent a declaration of default by the SBA the Bank lacked any right as a surety to make loans to DNH. We instead recognize the need to give a surety a proper degree of latitude in this situation.[6] There can be no doubt but that DNH was unable to proceed to complete the contract.

Toghotthele argues that the Bank should not be allowed to recover for the loans made to DNH because the loans did not reduce the letter of credit obligation. This factor is indeed a consideration in the decision as to whether to extend credit to a contractor, and it was considered here. The Bank has not sought indemnity for amounts in excess of the letter of credit, and the Bank has recognized that Gwitchyaa Zhee and Toghotthele's exposure was limited to the amount authorized by Doyon. In these circumstances the corporations have no cause to complain of the Bank's actions. Rather than increasing their liability, it is apparent that the decision to make additional loans prevented a call on the letter of credit, with resulting liability in the full amount of the guarantee made by Gwitchyaa Zhee and Toghotthele.

▮ The Bank's obligation was to act with reasonable care, in good faith, and after adequate investigation. Hartigan, *The Duty of an Indemnitee to an Indemnitor,* 41 Ins.Coun.J. 229, 230 (1974). A breach of this duty that materially harmed the party from whom the Bank seeks indemnification would be a bar to indemnity

---

5. *See also First Alabama Bank v. Hartford Acc. & Ind. Co.,* 430 F.Supp. 907, 911 (N.D.Ala. 1977).

6. Interpretation of the contract between the parties to provide indemnity in this situation is in accord with commercial practice. A standard indemnity agreement allows the surety indemnity for loans "used in the performance of obligations of the Principal under the contract covered by a bond . . . ." McNamara & Mungall, *Guide for the Drafter of a Contract Bond Indemnity Agreement,* 42 Ins.Coun.J. 291, 299 (1975). The drafters of this model agreement said this provision was inserted because a transaction "might conceivably be construed by a court as not having been sustained or occurred by reason of the execution of the bonds." *Id.* at 295. Here, the agreements between the Bank and the corporations purport to provide for indemnity for all loans to DNH. We need not decide on the overall validity of these agreements. We note instead that all parties agree that the corporations intended to act as indemnitors for the letter of credit, and conclude that the loans at issue here are within the scope of such a limited guarantee.

to the extent of the harm suffered. *Id.* at 230 & 235. The corporations have raised the question of whether the Bank met this standard, since it informed them at the January 1977 meeting that they were liable for past loans made to DNH. Even assuming that this action constituted a breach of the Bank's duty, we fail to see how it resulted in any material harm to Gwitchyaa Zhee or Toghotthele, as the Bank does not seek recovery for those loans.

Finally, we reject the arguments made by the corporations that the Bank breached trust duties either by failing to disclose the existence of the 1973 loan at the time Gwitchyaa Zhee and Toghotthele entered into the transaction, or by using documents that did not confine Gwitchyaa Zhee's and Toghotthele's liability to indemnifying the Bank as a surety. The Bank did not initiate these transactions, and any duties it may have owed as a trustee were unconnected to the agreement made by Gwitchyaa Zhee and Toghotthele to guarantee the letter of credit. It therefore did not have an obligation to tell the corporations about DNH's past difficulties. With respect to the use of broad guarantee documents by the Bank, we have found it necessary to apply those documents only in accord with the intentions of the corporations to afford indemnity for the letter of credit. We decline to afford Gwitchyaa Zhee and Toghotthele a windfall because they failed to protect themselves by obtaining narrower guarantees, since we have not given the Bank a possible windfall by allowing it indemnification for items beyond those encompassed in a narrowly drafted guarantee.

While the Bank urges us to direct the entry of summary judgment confirming its security interest, we decline to do so. Instead, the superior court should have an opportunity to consider the posture of the cases in light of our analysis and determine whether summary judgment is appropriate.[7] The lower court's orders and judg-

ments are therefore REVERSED and the cases are REMANDED.

---

[7]. In particular, the court on remand will want to examine the transaction to confirm our view that the Bank is seeking indemnity only for the loans made in January and February 1977, and

that the amounts sought from each corporation are in accord with the share of liability it agreed to assume.