Argued and submitted January 31, resubmitted In Banc December 3, 1986, reversed and remanded February 11, reconsideration denied April 10, petition for review allowed April 22, 1987 (303 Or 331)

STATE OF OREGON,
*Respondent,*

*v.*

HOWARD E. LYON,
*Appellant.*

(23-853; CA A35195)

733 P2d 41

Stephen J. Williams, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

VAN HOOMISSEN, J.

Newman, J., specially concurring.

## VAN HOOMISSEN, J.

Defendant appeals his conviction by a jury for murder. ORS 163.115. He contends, *inter alia,* that the trial court erred in allowing a police officer to testify about hearsay statements made by defendant's father. We agree and, therefore, reverse and remand for a new trial.

The essential facts are not in dispute. In August, 1984, hunters found human remains in a remote area of Tillamook County. The deceased was later identified as Terry Reiser. Detective Stephenson was assigned to investigate the death. On September 6, he went to defendant's home. Defendant lived there with his father, Harold Lyon, and Michael Stowell. Stephenson questioned defendant, who was not in custody, about Reiser's death.

On September 7, after advising defendant of his *Miranda* rights, Stephenson questioned him again. Stephenson told him that Reiser's remains had been identified and that he had died from a gunshot wound. Defendant denied any involvement in or knowledge of Reiser's death. Stephenson asked him if he would take a polygraph examination. He replied that he would. Stephenson also discussed Reiser's death with defendant's father and asked whether the father and Stowell would also take polygraph examinations. The father said that they would discuss it and that he would tell Stephenson the next day whether they would take the tests. Stephenson served defendant with a grand jury subpoena that required him to appear before the grand jury investigating Reiser's death.

On September 8, defendant's father told Stephenson that he and defendant wanted to talk with an attorney before taking polygraph examinations. Later that day, Stowell contacted the police and made arrangements to take the polygraph examination administered by Detective Plester. During Stowell's examination, defendant's father telephoned Stephenson and asked whether he and defendant could take polygraph examinations that day. Stephenson said that they could, and he made arrangements for the father to be examined first by Plester. The father took a polygraph examination, and then Stephenson drove him home. At the suppression hearing, Stephenson testified:

"We drove to the residence. Harold Lyon invited us inside.

Howard Lyon [defendant] was there. His father asked him — or stated to him, 'Well, it's your time. Do you want to take it?' And he said — excuse me. He — Howard Lyon said that he had been drinking. He had had one beer to drink, but he — and he was asked by his father, 'Do you want to take it or do you not? It's voluntary. You don't have to if you don't want to,' and he said — in effect, I think he said, 'Let's go for it,' and got his hat and coat and willingly accompanied us to the Beaverton Patrol Office."

Plester met defendant at the police station. He told him that he did not have to take the examination if he did not want to and he gave him *Miranda* warnings.[1] Defendant agreed to talk to Plester and to take a polygraph examination. He signed a "rights advisal form." Plester then read him a polygraph "stipulation" form.[2] He told defendant that he

---

[1] Plester advised defendant:

"It is my duty as a police officer and polygraph examiner to inform you of your rights.

"1. You have the right to remain silent. Do you understand that?

"2. You have the right to OR not to take a polygraph examination. Do you understand that?

"3. Anything you say can be used against you in a court of law. Do you understand that?

"4. You have the right to talk to a lawyer and have him present with you while you are being question. Do you understand that?

"5. If you cannot afford to hire a lawyer, one will be appointed to represent you at no expense to you before any questioning, if you wish one. Do you understand that?

"6. If you do give a statement, you can stop talking any time you wish. Do you understand that?

"7. If you decide to take a polygraph examination, you can stop the examination any time you wish. Do you understand that?

"8. Having these rights in mind, do you wish to talk to us and take a polygraph examination?"

Defendant signed the advice form.

[2] The form states:

"I, HOWARD LYON, do hereby request the opportunity to undergo a polygraph examination in connection with the investigation of the matter of the killing of Terry Reiser in order to use the results of said examination in my defense. I hereby certify that I have not previously taken or attempted to take a polygraph examination regarding the facts of this criminal charge.

"I hereby acknowledge that I fully understand the following rights concerning a polygraph examination.

"1. I have the right to remain absolutely silent and not speak to the polygraph examiner;

"2. Any statement I make to the examiner before, during and after the

knew defendant did not have an attorney. According to Plester, defendant stated that he understood that, "but he

---

examination can and may be used against me in a court of law;

"3. I have the right to consult an attorney concerning the advisability of making any statement, taking this examination and signing this stipulation;

"4. * * * * *

"5. I have a right to have my attorney present when I do make a statement; however, I agree that because of the nature of a polygraph examination my attorney may not be present in the room during the actual examination;

"6. I have a right to terminate this examination at any time with only those results already obtained being admissible for or against me in a criminal proceeding;

"7. Anything I say must be freely and voluntarily said;

"8. I have spoken with my attorney specifically regarding this stipulation and will waive the requirement that his signature appear hereon.

"I, NOW, KNOWINGLY, FREELY AND VOLUNTARILY WAIVE THESE RIGHTS SO THAT THE RESULTS OF THIS POLYGRAPH EXAMINA- TION MAY BE USED FOR OR AGAINST ME AT ANY CRIMINAL PRO- CEEDING TO WHICH THEY RELATE.

"I hereby acknowledge that I have had explained to me the operation of the polygraph machine and I believe it to be a scientifically reliable instrument and I stipulate that it is so reliable. I further have had an opportunity to discuss the background and qualifications of the operator, MICHAEL PLESTER, and I acknowledge that he is a qualified person by reason of his training and experience to operate the machine, administer the examination, interpret the results of the polygraph examinations given by him and render an expert opinion as to the truthfulness of the answers given. I also hereby acknowledge that I have been advised that the results of a polygraph examination are not ordinarily admissible as evidence in a court of law either for or against me without my consent and the consent of the District Attorney.

"I DO NOW, KNOWINGLY, FREELY AND VOLUNTARILY REQUEST THAT THE QUESTIONS PROPOUNDED BY THE EXAMINER, MY ANSWERS AND RESULTS OF THE ABOVE DESCRIBED POLYGRAPH EXAMINATION BE INTRODUCED AT ANY CRIMINAL PROCEEDINGS TO WHICH THEY RELATE AND DO STIPULATE THAT THESE RESULTS ARE ADMISSIBLE EVIDENCE FOR OR AGAINST ME IN ANY SUCH CRIMINAL PROCEEDING.

"The State of Oregon by and through the District Attorney reciprocally stipulates that the above polygraph results may be received in evidence for or against HOWARD LYON in any future proceedings involving the parties."

Defendant and by the prosecutor signed the form. *See State v. Skelton,* 41 Or App 479, 599 P2d 1171 (1979) (stipulation invalid because not signed by prosecutor.)

Right number "4":

"I have a right to a court-appointed attorney to be paid from public funds if I am without funds;"

was crossed out, and the notation "Not charged with crime," was added. As to right number "8"; Plester testified:

" 'I believe on my report it reflects also that on Right No. 8, I believe it is, I explained to Mr. Lyon at the time that I understood that he didn't have an attorney, and he said that he understood that he didn't have an attorney, and he said that he understood that, but he would agree to sign it and go along with the stipulation as it was read to him.' "

would agree to sign it and go along with the stipulation as it was read to him." Defendant then signed the form that Plester had just read to him.

After defendant took the polygraph examination, Plester concluded that he was not telling the truth. In defendant's presence, he told Stephenson, "This is your shooter." Stephenson arrested defendant, again advised him of his *Miranda* rights and asked him if he wanted to talk. Defendant then said that he wanted an attorney. Stephenson did not question him further.

On September 10, defendant's father testified before the grand jury, after which he visited with defendant for about 45 minutes. According to Stephenson, while he was driving the father home after the visit, the father told him that defendant "wanted to waive his right to counsel and to appear before the Grand Jury." Stephenson replied that he would so advise the District Attorney.

On September 11, Stephenson went to the jail. He testified:

"I went to the jail and I asked to have Mr. Lyon brought forward. They did. They brought him to the counter there. He said he didn't want to talk to me or make any statement to me and I said, before he says anything, I want to inform him of his rights and I read him his rights again from the standard form and said, 'This is concerning your wanting to testify before the Grand Jury. I am simply here to inquire whether or not you wish to do that.'

"He said that he — his statement was, 'Yes, that's exactly what I want to do.' I said that I would convey that to Mr. Heard and that if he was to testify before the Grand Jury, he would be brought down by Sheriff's Department staff, and I told the staff there that it would be — if it was going — if he was going to testify, it would be sometime in the future. They said they would make arrangements to have him brought down if they were so directed."

About 1:30 p.m., the police brought defendant to the grand jury. He was handcuffed and wearing jail clothing. The deputy district attorney advised him:

"If you want to talk to the grand jury, you may certainly do so. I am not going to force you, and you don't have an obligation to do so. You can if you wish."

Defendant stated that he wanted to testify and signed a waiver of rights card. The District Attorney told defendant that he understood that defendant would be charged with murder that afternoon by an information. Defendant responded that he still wanted to testify before the grand jury. About an hour later, he was arraigned on the information. An attorney was appointed to represent him. After a jury trial, defendant was convicted of Reiser's murder.

Defendant contends that the trial court erred in allowing Stephenson to testify about statements defendant allegedly made to his father on September 8 and September 10 and which the father allegedly repeated later to Stephenson. Neither defendant nor his father testified at trial.[3] Defendant argues that the statements were hearsay. The state argues that defendant's accounts of Reiser's death, as related by defendant to his father, who, in turn, related the statements to Stephenson, were false and that, therefore, the evidence was not offered to prove the truth of the matter asserted but, rather, to cast doubt upon the account of Reiser's death that defendant had given to the grand jury. The trial court held that, because the evidence was not offered to prove the *truth* of the matter asserted, it was not hearsay, and therefore, it was admissible. OEC 801(3).[4] We disagree.

■ Stephenson testified that defendant's father had told him that defendant had given the father a certain account of the death. The state offered Stephenson's testimony to prove that defendant had made the statements. That testimony was, therefore, offered to prove that defendant had made the statements to his father. The value of the evidence was dependent on the truth or falsity of the father's out of court assertion that defendant had made the statements to him. We conclude that Stephenson's testimony regarding what defendant allegedly told his father was inadmissible hearsay.

---

[3] Defendant argues that the state failed to show that his father was "unavailable" to testify at trial and that, therefore, the admission of his father's statements to Stephenson violated defendant's confrontation rights under the state and federal constitutions. That argument lacks merit. Defendant stipulated that, if called as a witness, his father would claim the privilege against self-incrimination. Therefore, he was unavailable. *See State v. Farber,* 295 Or 199, 209, 666 P2d 821 (1983).

[4] OEC 801(3) defines "hearsay":

"a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

■    The state argues that, even if the evidence was inadmissible hearsay, any error was harmless. *See* OEC 103(1); *State v. Miller,* 300 Or 203, 220, 709 P2d 225 (1985), *cert den* 106 S Ct 1793 (1986); *see also State v. Van Hooser,* 266 Or 19, 511 P2d 359 (1973); *State v. Harmon,* 77 Or App 705, 708, 714 P2d 271, *rev den* 301 Or 240 (1986). We disagree. At trial, defendant did not testify. His counsel told the jury that defendant's account of the cause of Reiser's death was the same the account that he had given the grand jury. His counsel told the jury that defendant's responses during the polygraph examination were influenced by his nervousness over initially having told the police that he last saw Reiser in Garibaldi, which was not true.

Defendant's "accidental death" account was impugned by Stephenson's testimony. The account of Reiser's death that Stephenson attributed to defendant, through his father, was significantly different from his grand jury account.[5] Moreover, Stephenson testified that defendant's father had told him that, on the day of Reiser's death, defendant had told Stowell that defendant had shot Reiser. We cannot say that there is little, if any, likelihood that that evidence did not affect the verdict in this case. We conclude that the trial court committed reversible error in permitting

---

[5] Defendant told the grand jury that Reiser's gun had discharged as Reiser tried to free it from some brush. Stephenson testified that defendant's father told him that defendant had stated that the gun had discharged when Reiser tripped and fell. Defendant told the grand jury that Reiser did not fall off the ridge after he was shot. In the Stephenson account, defendant told his father that Reiser fell off the ridge. Defendant told the grand jury that he was 150 yards from Reiser when Reiser's gun went off. In the Stephenson account, defendant told his father that he was only 100 feet away.

The state noted the differences in the two accounts in its closing argument:

"The last evidence that you heard in this case was the evidence of the grand jury testimony. Interestingly enough, there also is a difference in some degree. The story as it is coming on its way to grand jury about this accident, the story that Howard Lyon is about to tell, the one that he is getting ready to bring to the grand jury is just a bit different from the one he actually got to the grand jury with. After the polygraph test, after Howard and dad talked, dad relates it was an accident. He wasn't taken to the phone booth in Garibaldi. He shot himself by accident. How? Well, the squirrel hunting thing. He shoots, he takes off, he is going with his weapon, he trips, and he shoots himself on the way down as he is falling. That's the story that's being brewed for grand jury or for trial or for whenever. The story that he gives to the grand jurors, as I hear them telling it anyway, seems a bit different from that. They have got him falling, according to Howard, slumped over and then pulling on the weapon when it snags on something and goes off; a slight difference in testimony."

Stephenson to testify about statements that defendant allegedly made to his father.

■        Because other issues raised by defendant in this appeal are likely to arise on retrial, we shall consider them. Defendant contends that the trial court erred in denying his motion to suppress evidence of his polygraph examination. The trial court found that defendant knowingly and voluntarily stipulated to the admissibility of the polygraph evidence. Defendant does not contest the fact that he stipulated to the admissibility of the results of the polygraph test administered in this case, and his own statement of facts in his appellate brief clearly supports the trial court's finding that he knowingly and voluntarily did so. He argues, however, that polygraph evidence should *never* be admissible, even when stipulated to, and, in the alternative, that it should not be admissible in this case, because he had stipulated to its admissibility before he was charged and without the advice of counsel.[6] He points to no constitutional basis for his arguments, but asks that we adopt them as interpretations of OEC 403 and OEC 702. We decline to do so.[7] *See State v. Brown,* 297 Or 404, 445 n 35, 687 P2d 751 (1984); *State v. Bennett,* 17 Or App 197, 521 P2d 31 (1974); *State v. Bass,* 76 Or App 396, 708 P2d 1207 (1985); *State v. Skelton, supra,* n 2; *see also State v. Taylor,* 409 NE 2d 1246 (Ind App 1980); *but see State v. Valdez,* 91 Ariz 274, 371 P2d 894 (1961).[8]

---

[6] Defendant does not charge the police with any misconduct in connection with his stipulated polygraph examination. Rather, he argues for a *per se* rule, that no polygraph evidence would *ever* be admissible or, in the alternative, that no *uncounseled* would ever be valid. Such a rule would give an unrepresented defendant a tactical advantage not possessed by a defendant represented by counsel. *See State v. Addicks,* 34 Or App 557, 560, 579 P2d 289, *rev den* 284 Or 80a (1978).

If, after being advised of his *Miranda* rights, an uncounseled defendant may confess to murder and that confession may be used against him at trial, we fail to understand why an uncounseled defendant, after being advised as defendant here was advised, may not stipulate that polygraph evidence may be used against him at trial. Any *policy* arguments to the contrary should be addressed to the legislature, not to the courts.

[7] In 1975, the legislature enacted the Polygraph Examiners Act. ORS ch 703. It requires that all polygraph examiners be licensed by the state. Precise qualifications for licensure are stated. ORS 703.090. Polygraph equipment is regulated. ORS 703.310. The act is administered by the Board on Police Standards and Training. To our knowledge, no effort has ever been made in Oregon through administrative or legislative channels to do what defendant urges this court to do in this case.

[8] The special concurrence argues that "[m]ost suspects cannot adequately evaluate the risks inherent in polygraph evidence without counsel's advice" and that "[o]nly the

Defendant also contends that the trial court erred in denying his motion to suppress his grand jury testimony. He argues that use of the evidence violated his rights under Article I, section 12, of the Oregon Constitution and the Fifth Amendment. We disagree.

After defendant was told that the polygraph examination suggested that he was lying, he invoked his right to counsel. Stephenson testified that defendant's father, after talking with defendant, told Stephenson that defendant wished to "waive counsel and appear before the grand jury." Defendant does not argue that his father was acting at the behest of the police or that his father's statement to Stephenson was obviously improbable. Therefore, Stephenson could contact defendant to determine whether he wanted to appear before the grand jury. *See State v. Sparklin,* 296 Or 85, 93, 672 P2d 1182 (1983). When Stephenson contacted defendant, he said that he did not wish to talk. However, that statement was not a request for the assistance of counsel so as to then

---

most exceptional defendant could knowingly and voluntarily make such an assessment without the advice of counsel." 83 Or App at 606-608. Conspicious by its absence from the special concurrence is the citation to any legal authority or social science research supporting those arguments, and we are aware of none. Furthermore, in this case defendant does not argue that he did not understand his stipulation, nor does he argue that the police took advantage of him in any manner.

The special concurrence speculates that a contrary rule would likely defeat the goal of the Supreme Court, expressed in *Brown,* to keep polygraphs from becoming a regular feature of Oregon proceedings. 83 Or App at 606. Polygraphs have never been a "regular feature" in Oregon criminal proceedings and, after *Brown,* it is very unlikely that they will become one.

The special concurrence observes that the interrogation of a suspect who has waived his right to counsel is *unlikely* to produce a confession that is misleading or untrue. 83 Or App at 607. We agree. Most of the special concurrence's arguments against the use of stipulated polygraphs likewise are made routinely in trial and appellate courts against the use of uncounseled confessions. Those arguments have been rejected when uncounseled confessions are concerned and, for similar reasons, are rejected here. The argument in the special concurrence that "the evaluation of the validity and reliability of the evidence" in such cases is not as "complex and difficult as in the case of polygraph evidence," 83 Or App at 609, is not supported by any citation to authority.

The special concurrence criticizes the trial court's failure to "fully examine whether defendant understood the complexities and uncertainties involved in evaluating polygraph evidence." 83 Or App at 606-607. That criticism is unwarranted. The trial court commented at length about the circumstances under which defendant agreed to the stipulation, his knowledge that he had a right to an attorney, that there was no wrongdoing on the part of the police, defendant's education, that the procedure and its evidentiary implications were explained to him and that the operator was qualified. On this record, the trial court's examination was sufficient.

preclude Stephenson from any further inquiry about whether defendant wanted to testify before the grand jury. *See State v. Rowe,* 79 Or App 801, 720 P2d 765, *rev den* 302 Or 86 (1986). Neither was it inconsistent with defendant's request that he be allowed to appear before the grand jury. Stephenson could ask defendant if he wanted to appear before the grand jury. When defendant said that he did, Stephenson arranged for him to do so. The trial court did not err in holding that Stephenson did not violate defendant's rights under Article I, section 12.

There also was no violation of the Fifth Amendment. Although the police were required to respect defendant's invocation of his right to counsel, *Edwards v. Arizona,* 451 US 477, 101 S Ct 1880, 63 L Ed 2d 378 (1981), they could respond to his initiation of further contact as communicated to them by his father. *See Oregon v. Bradshaw,* 462 US 1039, 103 S Ct 2830, 77 L Ed 2d 405 (1983). Furthermore, defendant's statement that he did not wish to talk with Stephenson was not a request for the assistance of counsel so as to preclude Stephenson from asking whether defendant wanted to appear before the grand jury. *Compare Smith v. Illinois,* 469 US 91, 105 S Ct 490, 83 L Ed 2d 488 (1984).

■   Defendant argues that, because formal charges were pending against him when he testified, his testimony to the grand jury without the opportunity to consult with counsel violated his right to counsel under Article I, section 11, and the Sixth Amendment. We disagree. Between the time of defendant's conversation with Stephenson and defendant's grand jury testimony, the district attorney charged defendant with murder. Even if his right to counsel attached *before* his grand jury testimony, *see State v. Sparklin, supra,* 296 Or at 92, there was no violation of Article I, section 11. Because defendant had already requested counsel when he asked to testify to the grand jury, the police could not initiate any questioning. Nevertheless, before he was arraigned and before the court appointed counsel, *he* chose to initiate contact with the police about his testifying before the grand jury, to waive counsel and to testify before the grand jury. His decision was voluntary and not in response to any improper police conduct. *See State v. Sparklin, supra,* 296 Or at 93; *State v. Beaver,* 248 Or 101, 432 P2d 509 (1967). Similarly, the police did not

violate his rights under the Sixth Amendment.[9] The trial court did not err in denying defendant's motion to suppress his grand jury testimony.[10]

Reversed and remanded.

**NEWMAN, J.,** specially concurring.

I concur in the majority's holding that the trial court committed reversible error when it permitted Stephenson to testify to the hearsay statements that defendant's father made. I disagree with the majority, however, with respect to the evidence of defendant's pre-arrest polygraph examination. The trial court should have granted defendant's motion to suppress that evidence.

Defendant argues that polygraph evidence should never be admissible, even if a defendant stipulates to its admissibility. In the alternative, he argues that polygraph evidence should not be admissible here, because he had stipulated to its admissibility before he was charged and without the advice of counsel. Although on retrial defendant may also assert constitutional bases for his motion to suppress, he presently urges no constitutional positions, but asks that we adopt his arguments as interpretations of OEC 403 and OEC 702.

In *State v. Brown,* 297 Or 404, 687 P2d 751 (1984), the Supreme Court discussed in detail polygraphs and the use of polygraph evidence. It concluded that there was a serious risk of "misuse and overvaluation" of polygraph evidence by juries which "far outweighed" any probative value it might have. 297 Or at 441, 442. Accordingly, it held that polygraph evidence was not generally admissible under the Oregon Evidence Code. *See* OEC 401, 403 and 702. The court, however, explicitly left open the question of the admissibility of polygraph evidence by stipulation. 297 Or at 445 n 35.

In *State v. Bennett,* 17 Or App 197, 521 P2d 31 (1974),

---

[9] *See Michigan v. Jackson,* _____ US _____, 106 S Ct 1404, 89 L Ed 2d 631 (1986); *Maine v. Moulton* _____ US _____, 106 S Ct 477, 88 L Ed 2d 481 (1985); *Johnson v. Zerbst,* 304 US 458, 58 S Ct 1019, 81 L Ed 1461 (1938).

[10] We find no merit in defendant's argument that his grand jury testimony should have been suppressed because he was brought before the grand jury handcuffed and wearing jail clothing.

we upheld a conviction based in part on stipulated polygraph evidence.

> "Since the challenged testimony was introduced pursuant to the written stipulation * * * we decline to consider the question of its admissibility. The defendant cannot * * * challenge testimony the receipt of which was stipulated to by him at the trial. The effect of such a stipulation is an express waiver of any objection. It is not simply a failure to object. To allow a litigant to challenge evidence received pursuant to such a written stipulation would in reality be tantamount to a finding of incompetence of counsel. No such claim is here articulated by defendant. Furthermore, the trial judge, in denying the motion said:
>
>> " '* * * I am satisfied that the stipulation was properly entered into by the State and by the defense *and the defendant being represented by competent counsel,* and consequently, the polygraph is appropriately received into evidence. I heard all of the testimony and the evidence in this case.' (Emphasis supplied.)" 17 Or App at 200.

*See also State v. Bass,* 76 Or App 396, 708 P2d 1207 (1985). The question of whether an uncounseled, uncharged suspect can validly stipulate before trial to the admission of polygraph evidence, however, is one of first impression in Oregon.[1]

A number of courts have held that polygraph evidence is never admissible. That position was explained by the Illinois Supreme Court:

> "Polygraph evidence is not reliable enough to be admitted. The prejudicial effects substantially outweigh the probative value of admitting such testimony. As such 'usefulness to the court and jury * * * remains the same, regardless if they are admitted by stipulation or not.' (*People v. Zazzetta* (1963), 27 Ill 2d 302, 308, 189 NE2d 260.) There is nothing to show that jurors are better able to evaluate the testimony of polygraph examiners where both parties have stipulated that their testimony be heard." *People v. Baynes,* 88 Ill 2d 225, 244, 430 NE2d 1070 (1982).

Similarly, the Maryland Court of Appeals noted:

> "As we see it, the crucial issue is whether, as a matter of law, this type of evidence is sufficiently reliable or trustworthy. It

---

[1] *See State v. Skelton,* 41 Or App 497, 599 P2d 1171 (1979), where we held an uncounseled stipulation invalid, because the prosecuting attorney did not sign it.

cannot logically be argued that a stipulation enhances in any significant way the inherent reliability of evidence produced by a so-called scientific process or art. *See, e.g., Pulakis v. State,* 476 P2d 474, 479 (Alaska 1970). Even proponents of the use of polygraph evidence admit that a stipulation does not increase reliability.* * * Thus, while we are generally reluctant to invalidate agreements entered into by the parties, we view this as one of the unusual occasions when we are obligated to do so." *Akonom v. State,* 40 Md App 676, 680, 394 A2d 1213 (1978).

*See also State v. Dean,* 103 Wis 2d 228, 307 NW2d 628 (1981); *State v. Corbin,* 285 So 2d 234 (La 1973); *People v. Liddell,* 63 Mich App 491, 234 NW2d 669 (1975).

A different position is found in *State v. Valdez,* 91 Ariz 274, 371 P2d 894 (1962), to which the Oregon Supreme Court referred as the "leading case on stipulations for the admission of polygraph evidence." *State v. Brown, supra,* 297 Or at 445 n 35. The Arizona Supreme Court held that polygraph evidence is admissible pursuant to a stipulation under certain conditions:

"(1) That *the county attorney, defendant and his counsel all* sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state.

"(2) That notwithstanding the stipulation the admissibility of the test results is subject to the discretion of the trial judge, i.e. if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.

"(3) That if the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:

"a. the examiner's qualifications and training;

"b. the conditions under which the test was administered;

"c. the limitations of and possibilities for error in the technique of polygraphic interrogation; and

"d. at the discretion of the trial judge, any other matter deemed pertinent to the inquiry.

"(4) That if such evidence is admitted the trial judge should instruct the jury that the examiner's testimony does not tend to prove or disprove any element of the crime with

which a defendant is charged but at most tends only to indicate that at the time of the examination defendant was not telling the truth. Further, the jury members should be instructed that it is for them to determine what corroborative weight and effect such testimony should be given" 91 Ariz at 283. (Emphasis supplied.)

A number of courts have followed *Valdez* and have allowed polygraph evidence by stipulation when procedural safeguards, *including the advice of counsel,* are present. *State v. Renfro,* 96 Wash 2d 902, 639 P2d 737, *cert den* 459 US 842 (1982); *Corbett v. State,* 94 Nev 643, 584 P2d 704 (1978) (admissible when stipulation entered "freely and voluntarily, with the assistance of adequate counsel"); *see also State v. Galloway,* 167 NW2d 89 (Iowa 1969); *State v. McDavitt,* 62 NJ 36, 297 A2d 849 (1972).

I believe that we should follow *State v. Valdez, supra,* at least to the extent that it requires a defendant (or suspect) *and his counsel* to sign a stipulation for the admission of polygraph evidence. The problems with polygraph evidence are persuasively set forth in *State v. Brown, supra.* In *State v. Bennett, supra,* we stressed the importance of counsel's role in a defendant's valid stipulation to the admission of polygraph evidence. We should hold that counsel's advice is not only important; it is necessary. Most suspects cannot adequately evaluate the risks inherent in polygraph evidence without counsel's advice. Moreover, a contrary rule would likely defeat the goal of the Supreme Court, expressed in *Brown,* to keep polygraphs from becoming a regular feature of Oregon proceedings. Polygraph evidence is not generally admissible in Oregon, and we should not recognize an exception in the absence of a written stipulation signed by the defendant, his counsel and the prosecuting attorney.

The majority states that "[t]he trial court found that defendant knowingly and voluntarily" signed the stipulation. 83 Or App at 600. The record does not contain such an express finding. Even if the court's discussion and ruling could be deemed the equivalent of such a finding, the court did not fully examine whether defendant understood the complexities and uncertainties involved in evaluating polygraph evidence. In *State v. Brown, supra,* the Supreme Court took almost 40 pages to conclude that "after carefully evaluating evidence and arguments for and against the introduction of polygraph

evidence within the context of OEC 401, 702 and 403, we conclude that the probative value of polygraph evidence is far outweighed by reasons for its exclusion." 297 Or at 442. The court stated:

> "We conclude no judgment of polygraph testing's validity or potential rate of error can be established based on available scientific evidence. The polygraph test is, in reality, a very complex process that involves much more than the instrument or the polygram. Although the instrument is essentially the same for all applications, the types of individuals tested, the training of the examiner, the purpose of the test, the type of test utilized, the questions asked, among many other factors, can differ substantially. In spite of all these variables in polygraph testing, the polygraph experts persist in telling the trier of fact, as they did in this case, that polygraph tests are virtually infallible." 297 Or at 433. (Footnote omitted.)

Contrary to the majority's suggestion, a defendant's uncounseled stipulation to the admissibility of polygraph evidence cannot be equated with other actions that a defendant may take without the advice of counsel. A defendant who waives his right to trial by jury is not accepting an unreliable fact finder. A voluntary confession obtained by the interrogation of a suspect who has waived his right to counsel is not likely, in most cases, to be unreliable. In neither case is the evaluation of the validity and reliability of the evidence that is obtained as complex and difficult as in the case of polygraph evidence.

To stipulate knowingly and voluntarily that the results of a polygraph test are admissible, a defendant should be aware of the existence and importance of the variables that affect the reliability and validity of the results, be able to assess the effect which the evidence is likely to have on a jury and be able to weigh that effect against the possibility of error and ambiguity inherent in polygraph evidence. In short, to stipulate knowingly and voluntarily, a defendant should make an evaluation of the polygraph process similar to that which *State v. Brown, supra,* bans trial courts from making in the absence of a stipulation. Only the most exceptional defendant could knowingly and voluntarily make such an assessment without the advice of counsel. Certainly nothing in this record indicates that defendant had the requisite understanding or that the court determined that he did.

In *State v. Brown, supra,* the Supreme Court, exercising its supervisory power, decided that, in the absence of a stipulation, trial courts do not have discretion to admit polygraph evidence. To determine if a defendant stipulated knowingly and voluntarily, a trial court must ascertain whether he made the kind of evaluation that *Brown* bars a trial court from making in the absence of a stipulation. We should hold that a defendant's uncounseled stipulation cannot make polygraph evidence admissible.

I would hold that a defendant can validly stipulate to the admission of polygraph evidence only with the advice of counsel, who also must sign the stipulation.[2] On the other hand, I would not adopt the stricter rule, which would preclude the use of polygraph evidence even if the defendant has been advised by counsel who also signs the stipulation. If a defendant, with the advice of counsel, decides that he wishes to take a polygraph and stipulate with his counsel to the admission of the results, he should be able to do so. A defendant, in consultation with his attorney, is ultimately responsible for deciding how to conduct his defense. *See State v. Peterson,* 70 Or App 333, 344, 639 P2d 985 (1984). Here, however, defendant signed a stipulation without the advice of counsel, and his counsel did not sign it. We should hold that the court erred when it did not grant defendant's motion to suppress the evidence of his polygraph examination.

Richardson, Buttler and Warden, JJ., join in this specially concurring opinion.

---

[2] If, however, a defendant has waived his right to counsel at trial, *see Faretta v. California,* 422 US 806, 95 S Ct 2525, 45 L Ed 2d 562 (1975), a written stipulation signed by defendant alone may be sufficient.