**UNITED STATES of America, Plaintiff,**

v.

**Lydia Frances URQUIDEZ, Defendant. Crim. No. 11314 (WPG).**

United States District Court, C. D. California.

April 13, 1973.

**1364**

———◆———

William D. Keller, U. S. Atty., Eric A. Nobles, Chief Crim. Div. by Jan L. Handzlik and Richard Kirschner, Assistant U. S. Attys., Los Angeles, Cal., for plaintiff.

John K. Van de Kamp, Federal Public Defender by Alan L. Isaacman, Deputy Federal Public Defender, Los Angeles, Cal., for defendant.

## MEMORANDUM AND ORDER GRANTING MOTION TO STRIKE EVIDENCE

WILLIAM P. GRAY, District Judge.

This case is a criminal prosecution for two sales of heroin to an agent of the United States Bureau of Narcotics and Dangerous Drugs, acting in an undercover capacity. The defendant, a young woman, has admitted the sales but raises the defense of entrapment. She contends and has testified that, before the agent made his first request that she obtain heroin for him, he had sexual intercourse with her in order to increase his attraction to her and thus make her more likely to accede to his request. The agent has denied any such conduct.

Defense counsel advised the court that the defendant had taken a polygraph (lie detector) test and that the results confirmed the truth of her testimony. Defense counsel thereupon requested that the court receive evidence concerning such test and its results. The Government opposed the motion, and added that it could present a polygrapher who would testify that the subject test did not support the defendant's truthfulness.

In view of the nature of this rather novel and significant entrapment issue, the complete lack of evidence thereon, other than the contradictory testimony of the two individuals, and the fact that a jury had been waived, this court concluded that a favorable opportunity was presented to consider whether polygraphic evidence should properly be received in furtherance of resolving this evidentiary conflict. The court's willingness to consider such matters was enhanced by its awareness of the recent decision of the Court of Appeals in United States v. De Betham, 470 F.2d 1367 (9th Cir. 1972). In that case, the refusal of the trial judge to receive evidence concerning a polygraphic test was affirmed as not being an abuse of discretion, and also because it appeared that the trial judge would not have believed the defendant irrespective of the polygraph test. However, the court expressly declined to hold that polygraphic evidence is "never admissible."

Accordingly, with the full cooperation of counsel, this court spent three full days hearing testimony by qualified experts concerning the nature and functioning of the polygraph instrument, the technique of administering a lie detector test, the validity of the test administered to this defendant, and the meaning of the results derived therefrom. In addition, the court has read and considered

(pursuant to stipulation) proffered exhibits in the form of published articles on various aspects of polygraphy, as well as transcripts of the testimony of certain experts at the trial in the above-mentioned *De Betham* case.

All of the polygraphic evidence was received by this court subject to a later ruling upon the Government's motion to strike. For reasons hereinafter set forth, the motion to strike is now granted.

In Commonwealth v. Fatalo, 346 Mass. 266, 191 N.E.2d 479 (Mass.1963), the Supreme Court of Massachusetts upheld the trial court in having rejected all evidence concerning a lie detector test. In referring to an offer of proof by the defendant, which the prosecution opposed, the opinion stated:

"It is precisely this sort of controversy which creates the danger that on the introduction of such evidence a trial could descend into a battle of experts on the probative value of the polygraph test rather than a determination of the guilt or innocence of a defendant. The end result, in all likelihood, would be confusion instead of enlightenment." (Pp. 480–481).

This is precisely what occurred here. The most obvious conclusion that resulted from the three days of testimony is that there are many variables, other than the ultimate question of truth or falsity, that can influence the results of a polygraph test. There are also many areas in which "experts" can disagree as to the appropriateness of the way in which the test is given and as to how the results should be interpreted. Some of the controverted issues in these proceedings will be listed and summarized below, for illustrative purposes. First, however, a few introductory comments are indicated concerning the nature of the polygraph instrument and the procedure for its use in testing.

The word, "polygraph," means multiple charts or graphs. The function of the polygraph device is to measure and record certain involuntary physiological responses of an individual that result from his mental reactions as he answers carefully prepared series of questions. The most commonly used polygraph machines note in graphic form the changes in blood pressure, respiration, and the amount of perspiration emitted by the palms of the hands (galvanic skin response).

Polygraphic testing is conducted upon the impressively supported and presumably valid assumptions, among others, that (a) the extent of a person's polygraphically recorded arousal is affected by the extent to which he believes the question to be of significant relevance and importance to him; (b) in answering a particular question, a lie causes a greater arousal than does the telling of the truth; (c) the detection of a lie occurs when a person gives *disparate* physiological responses to questions that would be expected to elicit *equivalent* responses from an innocent person.

The procedure for carrying out the polygraphic examination begins with a pre-test interview between the examiner and the subject. The purposes of such interview include enabling the examiner to gain the confidence of the subject, to cause the latter to believe that the test will reveal a lie, and to motivate him to participate seriously and wholeheartedly in the testing process.

In order to enhance such belief and motivation, the examiner usually demonstrates the "infallibility" of the polygraph by conducting what is known as a "stim" (stimulation) test. This normally involves having the subject select one of several numbered cards. He is then "hooked up" to the polygraph and is asked, in turn, whether he selected the respective numbers and is instructed to answer "no" to all such questions, including the one that should in truth be answered "yes." He is then shown how the polygraph has registered a comparatively larger (and thus "telltale") reaction to his "lie."

In the pre-test interview the examiner, with the help of the subject, con-

structs the wording of one or more questions concerning the subject's guilt or innocence of the crime charged. These are called the "relevant" questions. He also creates, again with the subject's participation, certain "control" questions. The control questions should be completely unaffected by, and have no overlapping significance with, a relevant question. A control question should be designed to evoke, in an innocent person, a physiological response equal to or greater than his response to the key relevant question. But the control question must not be of such importance in the mind of the subject that a false answer would elicit a greater physiological response to it than would a false answer to the relevant question.

After the pre-test interview is completed and all of the questions prepared, the actual examination takes place by the examiner asking all of the prepared questions (including the relevant questions, the control questions, and certain others that polygraphic expertise prescribes) in a mutually predetermined order, and the physiological reactions are recorded and interpreted. Often, the entire process is repeated one or more times.

Based upon the education and experience provided in this case, there are summarized below some of the ways in which a litigant might reasonably be expected to (and here did) seek to challenge the proffered results of a polygraph test.

*The "Motivation" Of The Subject.* The validity of the test is substantially influenced by how important it is to the subject that he be vindicated by it. Thus, the following questions become relevant: (a) How greatly is he concerned about the seriousness of the offense charged and about the result that might stem from his conviction? (b) How strong is his belief in the ability of the polygraph test, as it is being conducted, to "catch" him if he lies? (c) How is his motivation affected if he has "beaten the machine" in a "stim" test or

in a prior test? (d) What is the effect upon his motivation if he knows that any adverse results of the test cannot be used in court against him?

*The Subject's Physical And Mental Condition.* A subject's physiological arousal by a question can be affected by: (a) fatigue, due to a prolonged pre-test interview, or by repeated testing, or from any other cause; (b) the use of depressant drugs; (c) uncertainty as to the meaning of a question, or sudden surprise; (d) (arguably) his ability intentionally to acquire a state of mind of general lack of concern or non-arousal, or to increase his arousal to non-relevant questions, in order to "beat" the test.

*The Competence, Integrity And Attitude Of The Operator.* The manner in which the operator conducts the pre-test interview and the test, itself, is extremely important to the validity of the test: (a) The operator's belief in the innocence of the subject, if communicated in any manner to the latter, may reassure him and affect his responses. (b) The results of a test are likely to be affected by the subject's confidence, or lack of confidence, in the operator. (c) The manner in which a question is asked, an inflection, a facial expression, or an accusatory tone can increase or diminish the subject's response to a particular question.

*The Wording Of The Relevant Questions.* In this case, the key relevant question was "Did you deliberately lie to me when you said you had 'sex' with David?" The experts disagreed at length as to whether a question so phrased could be the basis for a reliable test.

*The Appropriateness Of The Control Question.* In our case, a principal control question was: "Between the ages of 14 and 24, did you ever deliberately lie to your mother, Lupe, about a matter of great importance?" In the first two tests (there were three) this question produced a greater physiological response than did any other. The validity of the question was challenged on the grounds that: (a) It partook of being a

relevant question, inasmuch as the defendant was 24 years old at the time of the alleged contact with the agent. (b) The response could not be evaluated without understanding imponderables such as: (1) the emotional relationship between the defendant and her mother; (2) what were the matters of "great importance"; (3) how significant were such matters to the defendant as compared with her concern about the subject prosecution?

Another control question involved whether the subject (the defendant) had lied to her priest. This inspired at the hearing a vigorous controversy as to whether religious matters should be injected into a control question, and as to the extent to which the emotional concern of the subject might be aroused by such a question as compared to the relevant question.

*The Reading Of The Graphs.* The process of reading the charts involves considerable interpretation, and the possibility that the examiner's biases may affect his conclusions cannot be discarded. Although there was expert testimony indicating that all qualified polygraph examiners would interpret a chart in the same manner, this did not happen here. In this case, the defendant's experts read the responses to the relevant questions as indicating non-deception; the Government's expert found the same responses to indicate deception, but he felt the whole test to be invalidated by the control questions.

Although not emphasized in this opinion, I have become convinced by the testimony in this case that there is much to be said for the polygraphic art. It undoubtedly has many valid uses, and its principal objective is to provide a means for ascertaining the truth, which is in harmony with the goals of the judicial process. The physiological and technical assumptions upon which it relies appear to be valid, and it may well be that further developments and refinements in the utilization of the polygraph may some day merit its being accorded a place in a court proceeding.

However, although the inquiry was far from complete, the experience of this case has amply shown that, as of now, the validity of a polygraphic test is dependent upon a large number of variable factors, many of which would be very difficult, and perhaps impossible, to assess. In a given case, the time required in order to explore and seek to adjudge such factors would be virtually incalculable (we did little more than make a beginning in the present case). Accordingly, this court is impelled to the conclusion that the administration of justice simply cannot tolerate the burden of litigation inherently involved in such a process.

For the reasons hereinabove set forth, the Government's motion to strike all evidence concerning the results of the polygraphic examination of the defendant is granted.

It is believed appropriate to add that, even if the results of the polygraphic examination here concerned were to be received, the amount of reliance that I would be able to place upon them would not overcome the conclusions reached upon hearing the testimony on the above-described entrapment issue.