SARAH ISABEL WHITE *v*. STATE OF INDIANA.

[No. 177S11. Filed October 25, 1978. Rehearing denied December 13, 1978.]

*Clifford G. Antcliff, Antcliff & Brown,* of Greenwood, for appellant.

*Theodore L. Sendak,* Attorney General, *Robert J. Black,* Deputy Attorney General, for appellee.

HUNTER, J.—The defendant, Sarah Isabel (Cindy) White, was convicted of arson and six counts of felony murder. She was sentenced to the Indiana Women's Prison for not less than five nor more than twenty years on the arson conviction; she was sentenced to the Indiana Women's Prison "for and during life" on each of the six murder convictions. In the defendant's appeal to this Court, four questions are raised:

1. Should the trial court have granted the defendant's motion to suppress the photographs of the bodies of the burn victims?

2. Did the trial court err in allowing testimony regarding the results of a polygraph test to be introduced within the state's case in chief?

3. Did the state prove the necessary elements of arson beyond a reasonable doubt?

4. Is direct evidence necessary to establish guilt in an arson felony murder?

Neighbors alerted the fire department on December 31, 1975, that a home located at 24 Sayre Drive, Greenwood, Indiana, was in flames. The defendant was seen coming from the rear of the home; she was hysterical, screaming, and was restrained from reentering the burning home. The residence

was the dwelling house of Charles and Carol Roberson and their four minor children, Michael, Dale, Gary, and Rita. All six of the Robersons perished in the fire. The coroner testified that each of them died from carbon monoxide and smoke inhalation. The defendant had been living with the Roberson family. ..

After an extensive investigation into the cause of the fire, it was determined that the fire had been deliberately set. Burn patterns found in the home showed that an accelerant such as gasoline had been used. The accelerant caused the rapid burning of the home as well as the intense heat generated. Experts testified that the occupants of the home had probably perished within a few minutes of the initial conflagration.

The defendant was burned only slightly. Her testimony was to the effect that she had awakened from her bed on the living room couch, seen the flames on the wall near the Christmas tree, alerted the family, and attempted to get the children out. The smoke was so thick, though, that she lost touch with the children; she exited through a small, rear bedroom window, thinking that the children and the family would be behind her.

Testimony elicited at trial revealed that the defendant had made a telephone call, on the night of the fire, to her sister-in-law. The defendant was inquiring about a fire, which had occurred two days earlier, at her grandmother's home. The defendant was most interested in how the fire started and in whether her siblings (who were living with her grandmother) had received new clothes as a result of the fire. It was less than four hours after the defendant had inquired about the fire at her grandmother's house that the Roberson home was in flames. The arson investigators stated unequivocally that the Roberson fire was not accidental. The Christmas tree was a flame-proof variety; tests within the courtroom demonstrated that the tree would melt before it would ignite. The wiring, the appliances, the gas lines, and the furnace of the

Roberson home were all checked. The results demonstrated that the fire itself had damaged each system, rather than the system causing the fire.

Additional evidence was introduced. Nude and pornographic photographs of the nineteen-year-old defendant were found in Charles Roberson's billfold. Love letters written by the defendant to Charles Roberson were also found. The pajamas worn by the defendant were shown to be made of a highly flammable material; yet they were not burned at all. Inconsistencies in the defendant's recollection of the fire were demonstrated through the testimony of those to whom the defendant had told her story. The defendant had a history of emotional disturbance, especially since the death of her father, and had spent the year prior to moving in with the Robersons as a patient in LaRue Carter Hospital.

## I.

The defendant moved, at trial, to suppress the photographs of the bodies of the burn victims on the basis that the photographs would be unduly prejudicial and generally inflammatory to the jury. The trial court suppressed many of the photographs offered by the state, but did admit one photograph each of the victims. The photographs which were admitted showed the bodies of the victims in the positions in which they were found after the fire. The photographs were identified at trial by the coroner who testified as to the condition of the body of each victim and to the cause of death.

Relevancy is the controlling question to be answered regarding the propriety of admitting the photographs into evidence. The relevancy of a photograph is to be determined by an inquiry as to whether or not a witness would be permitted to describe the objects or scenes photographed. *Pierce* v. *State*, (1970) 253 Ind. 650, 256 N.E.2d 557. In this case, the coroner testified (without objection) that Charles Roberson's body, which had been found

in the living room, partly on the couch, was the most charred of all of the victims. The coroner further testified that the degree of burns on the corpses corresponded with the arson investigators' findings regarding the rooms in which the corpses had been found. Therefore, the photographs were not only relevant, they tended to prove or disprove a material fact in issue: could the defendant have been asleep on the living room couch (the living room had the greatest amount of fire) and have reasonably escaped injury? The trial court did not err in admitting the six photographs. *Carroll* v. *State,* (1975) 263 Ind. 696, 338 N.E.2d 264; *Lund* v. *State,* (1976) 264 Ind. 428, 345 N.E.2d 826.

## II.

The defendant's second allegation of error is that the trial court should not have allowed the state to introduce testimony regarding the results of a polygraph test within the state's case in chief. The defendant admits that she stipulated prior to the taking of the test that the results could be used as evidence at trial. She now argues, however, that the state should have only used the evidence in rebuttal, as a form of impeachment. She cites certain Indiana cases which have approved the admissibility of polygraph tests, after expressed waivers, in rebuttal testimony. *See Reid* v. *State,* (1972) 259 Ind. 166, 285 N.E.2d 279; *Zupp* v. *State,* (1972) 258 Ind. 625, 283 N.E.2d 540. She argues that this Court, by its holding in *Vacendak* v. *State,* (1976) 264 Ind. 101, 340 N.E.2d 352, *prohibits* the use of polygraph test evidence, other than in rebuttal, by its statement that "the degree of accuracy of these tests, currently rated at eighty per cent, is not sufficient to mandate their admission on the question of guilt or innocence." *Vacendak* v. *State, supra.* This is an incorrect reading of *Vacendak;* "some form of waiver" is all that is required.

We have carefully reviewed the record of the waiver hearing at which the defendant agreed to allow the results of

the polygraph test into evidence. There is every indication that the defendant made no reservations upon the use of the evidence.[1] She clearly waived her right to object to its admission, and the trial court did not err in admitting it. Moreover, we would note that the trial court specifically instructed the jury that: (1) the polygraph test is not considered to be more than eighty per cent accurate; (2) a polygraph examiner's testimony does not tend to prove or disprove any element of the crime with which the defendant is charged; and (3) it is the function of the jury to determine what corroborative weight and effect the testimony should be given. The polygraph examiner was closely cross-examined by the defense attorney. While we would agree that it remains within the trial court's discretion to admit or refuse to admit the results of a polygraph examination after a waiver has been obtained, there was absolutely no showing in this case that such discretion has been in any way abused.

---

1. The defendant was questioned by her attorney and by the trial court judge:

### DIRECT EXAMINATION
QUESTIONS BY MR. ANTCLIFF, ATTORNEY FOR DEFENDANT.

Q. "Would you state your name for the record, Cindy?"
A. "Sarah Isabel White."

Q. "And, uh, you're currently in jail, is that correct?"
A. "Yes, I am."

Q. "And you realize the charges that are pending against you?"
A. "Yes, I do."

Q. "And you realize your constitutional rights?"
A. "Yes, I do."

Q. "You understand that you have a right to remain silent and not do anything that would tend to incriminate you, you understand that?"
A. "Yes, I do."

Q. "You have an attorney, is that right?"
A. "Yes, I do."

Q. "And I'm your attorney, is that correct?"
A. "Yes, you are."

Q. "And you and I have discussed the possibility of taking a polygraph test, have we not?"
A. "Yes, we have."

## III.

Since the defendant was convicted of felony murder, that is, murder committed in the perpetration of a felony (arson), she focuses the attention of this Court upon the elements of arson. She argues first that the state failed to prove the

Q. "And you understand what that test is?"
A. "Yes, I do."
Q. "And do you understand that if you agree that—not to take it that you do not have to take it and nobody can force you to take it?"
A. "Yes, I do."
Q. "And if you do take it that it can—the results of that can be used at your trial, you understand that?"
A. "Yes, I do."
Q. "And understanding those things are you willing on the record to agree to take such tests?"
A. "Yes, I am."
Q. "And do you understand that if we take this test, under this agreement, that whatever the results are it would be admitted into your trial?"
A. "Yes."

MR. ANTCLIFF: "Anything else you want to establish?"
COURT: "Knowing that, you're willing to take the test, knowing that they will be admitted in—in the trial of this cause, the results?"
A. "Yes."

COURT: "And good or bad, they'll go into evidence."
A. "Yes, because I am telling the truth."
COURT: "Well, that—but nevertheless, they—they will go into evidence and you understand that?"
A. "Yes, I do."

     \* \* \*

COURT: "Uh, Miss White, do—do you understand that without this waiver that the results of this test are not admissible."
MISS WHITE: "Yes, I do."
COURT: "Do you understand that?"
MISS WHITE: "Yes."
COURT: "And knowing that, knowing that the Court would not admit those—the results of those tests in evidence unless you waive that right, you still wish to waive the right?"
MISS WHITE: "Yes, I do."
COURT: "Okay. I thought maybe that ought to be explained to you. Okay."
MR. ANTCLIFF: "Thank you."

necessary elements of arson beyond a reasonable doubt, and second that direct evidence is necessary to establish guilt in an arson felony murder. These issues are intertwined, and we shall combine them for discussion.

Ind. Code § 35-16-1-1 (Burns 1975) provides that any person "who wilfully and maliciously sets fire to or burns, or causes the setting of fire to or the burning, . . . of any dwelling house, . . . such being the property of another; . . . shall be guilty of arson in the first degree . . . ." Ind. Code § 35-16-1-7 (Burns 1975) adds that "[s]hould the life of any person or persons be lost by reason of or because of the violation of any of the provisions of any of the foregoing sections of this act [35-16-1-1—35-16-1-6], the person or persons guilty of such violation shall be deemed guilty of murder in the first degree . . . ."

The defendant's arguments encompass the theory that the evidence was insufficient to support the convictions. We shall not weigh evidence or judge witness credibility upon appeal; rather we look only to the evidence which tends to support the jury's verdict. *Collins* v. *State*, (1977) 267 Ind. 233, 369 N.E.2d 422. Our examination of the record reveals certain facts: (1) the defendant had been living in the Roberson home; (2) experts determined that the Roberson fire had been started through a non-accidental source and that an accelerant had been used; (3) the defendant had shown an interest in fires in the hours immediately preceding the Roberson fire; (4) the defendant escaped substantial injury despite the fact that she supposedly had been sleeping in the most fire-gutted room of the house; (5) the defendant's account of her actions is implausible on the whole; (6) the defendant had access to at least two types of accelerants.

These facts are sufficient to show that the Roberson fire was set willfully or maliciously, that the burned home was a dwelling house, that the burned home did not belong to the defendant, and that the jury's verdict finding the defendant

guilty of arson was amply supported by circumstantial evidence. *See Smock* v. *State,* (1966) 247 Ind. 184, 213 N.E.2d 896.

The defendant's contention that direct evidence is necessary to support the murder convictions is without merit. Under the statutes, it is clear that once the defendant has been found guilty of arson (even if such finding of guilty is supported only by circumstantial evidence), a showing that lives have been lost as a result of the arson is all that is additionally necessary to support the murder convictions.

For all the foregoing reasons there was no trial court error, and the judgment of the trial court should be affirmed.

Judgment affirmed.

Givan, C.J., Prentice and Pivarnik, JJ., concur.

DeBruler, J., dissents with opinion.

### DISSENTING OPINION

DeBruler, J.—Suspicion naturally befalls the lone survivor of a set house fire because one cannot help but wonder why such person survived while others of equal strength and circumstance did not. That suspicion arose here and was reinforced before the jury by the testimony of the polygraph operator who testified that appellant's negative response to the question, did you set fire to the house, indicated deception. These two factors were the mainstays of the prosecution's case against appellant. The tenuity of the other items of evidence identified as significant in the majority opinion to support the required inference that appellant set fire to the Roberson house, is even greater. I cannot agree that the record shows that appellant had an interest in "fires", escaped substantial injury, or that her account of her actions was implausible on the whole. At 7:00 p.m. on the night of the Roberson fire appellant spoke on the phone with her sister-in-law and they talked about the fact, uncontradicted at trial, that appellant's grandmother's house had burned

two days before and that appellant's four brothers and sisters who lived there had lost their clothing in that fire. In the course of this telephone conversation appellant asked how the fire started. There is nothing unnatural or sinister about this inquiry, and it does not support the inference that appellant was interested in "fires" in general or that she was planning to burn the Roberson house.

According to the testimony of nurses who received appellant at the emergency room of the hospital, appellant at the time had singed hair, her face was sooty and burned, she had no shoes on and her feet were muddy and dirty, and her forearms were burned to the extent that a physician immediately had to debride them. She was given a shot of Demerol for pain, her arms were put in soaks, she was catherized and was removed as a precautionary matter to the intensive care unit. This was a serious injury.

I do not agree that appellant's account of the events of the fire was shown by the evidence to be implausible. The first account was given by appellant to the physician in the emergency room after the burned flesh had been removed from her arms and after she had been calmed down by a shot of Demerol. This account was overheard by a nurse who was present in the emergency room and who testified about it as follows at the trial:

"A. He asked her what happened and she said that she was in a house fire, that she was sleeping on the couch and she woke up and there was a fire in her room, she went to the parents bedroom, woke them up, and the mother and she went into the childrens room and the mother told her to climb out the window and she would hand the children to her.

Q. And did she make any further comment?

A. She said that no one else came out of the house.

Q. Alright, and was that the sum and substance of the— the statement?

A. Yes."

The basic elements of this account were included in fuller accounts given by her to the fire marshall and to the jury. I find no implausibility in any of them which could be considered as evidence of guilt.

The evidence presented to the jury served only to create a distinct suspicion that appellant set this fire, and does not constitute substantial evidence of such act. Evidence such as this cannot support a guilty verdict. *Manlove* v. *State,* (1968) 250 Ind. 70, 232 N.E.2d 874. I would reverse appellant's conviction.

NOTE.—Reported at 381 N.E.2d 481.