Argued and submitted June 2, Court of Appeals affirmed and remanded to trial court for new trial October 13, 1987

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## HOWARD E. LYON,
*Petitioner on Review.*

(TC 23-853; CA A35195; SC S33792)

744 P2d 231

Stephen J. Williams, Deputy Public Defender, Salem, argued the cause for petitioner on review. With him on the petition was Gary D. Babcock, Public Defender, Salem.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent on review. With him on a supplemental memorandum were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

CAMPBELL, J.

Linde, J. concurred and filed an opinion.

## CAMPBELL, J.

In *State v. Brown,* 297 Or 404, 445, 687 P2d 751 (1984), we held that polygraph evidence is not admissible, over proper objection, in any civil or criminal trial in this state. We reserved opinion as to the admissibility of such evidence pursuant to a preexamination stipulation. *Id.* at 445 n 35. We accepted review of this case to resolve that issue. For the reasons set out below, we hold that polygraph test results are inadmissible as evidence in the courts of this state, even when admissibility has been stipulated by the parties.

Defendant was convicted of murder in the shooting death of Mr. Terry Reiser. At defendant's trial, the court permitted the state to introduce into evidence against defendant the results of a polygraph examination administered by detective Michael Plester. Before taking the examination, defendant had received *Miranda* warnings and had read and signed a "polygraph stipulation form."[1] Defendant had not yet

---

[1] The form read:

"I, HOWARD LYON, do hereby request the opportunity to undergo a polygraph examination in connection with the investigation of the matter of the killing of Terry Reiser in order to use the results of said examination in my defense. I hereby certify that I have not previously taken or attempted to take a polygraph examination regarding the facts of this criminal charge.

"I hereby acknowledge that I fully understand the following rights concerning a polygraph examination.

"1. I have the right to remain absolutely silent and not to speak to the polygraph examiner;

"2. Any statement I make to the examiner before, during and after the examination can and may be used against me in a court of law;

"3. I have the right to consult an attorney concerning the advisability of making any statement, taking this examination and signing this stipulation;

"4. * * * * *

"5. I have the right to have my attorney present when I do make a statement; however, I agree that because of the nature of a polygraph examination my attorney may not be present in the room during the actual examination;

"6. I have a right to terminate this examination at any time with only those results already obtained being admissible for or against me in a criminal proceeding;

"7. Anything I say must be freely and voluntarily said;

"8. I have spoken with my attorney specifically regarding this stipulation and will waive the requirement that his signature appear hereon.

"I, NOW, KNOWINGLY, FREELY AND VOLUNTARILY WAIVE THESE RIGHTS SO THAT THE RESULTS OF THIS POLYGRAPH EXAMINATION MAY BE USED FOR OR AGAINST ME AT ANY

been charged with the crime and was not represented by counsel when he signed the stipulation and took the examination. The results of the examination were not favorable to defendant. The court also permitted the state to introduce, over objection, out-of-court statements made to police by defendant's father and defendant's testimony before a grand jury.

Defendant appealed his conviction, assigning as error the admission of each of these pieces of evidence.

The Court of Appeals concluded that the out-of-court statements made by defendant's father were inadmissible hearsay and that their admission into evidence was reversible error. The court remanded on that basis for a new trial. *State v. Lyon*, 83 Or App 592, 733 P2d 41 (1987). However, the court rejected defendant's arguments regarding the introduction of the polygraph results and of his grand jury testimony. *Id.* at 602-03. Defendant petitioned this court to review those issues.

Defendant raises three alternative arguments against

---

CRIMINAL PROCEEDING TO WHICH THEY RELATE.

"I hereby acknowledge that I have had explained to me the operation of the polygraph machine and I believe it to be a scientifically reliable instrument and I stipulate that it is so reliable. I further have had an opportunity to discuss the background and qualifications of the operator, MICHAEL PLESTER, and I acknowledge that he is a qualified person by reason of his training and experience to operate the machine, administer the examination, interpret the results of the polygraph examinations given by him and render an expert opinion as to the truthfulness of the answers given. I also hereby acknowledge that I have been advised that the results of a polygraph examination are not ordinarily admissible as evidence in a court of law either for or against me without my consent and the consent of the District Attorney.

"I DO NOW, KNOWINGLY FREELY AND VOLUNTARILY REQUEST THAT THE QUESTIONS PROPOUNDED BY THE EXAMINER, MY ANSWERS AND RESULTS OF THE ABOVE DESCRIBED POLYGRAPH EXAMINATION BE INTRODUCED AT ANY CRIMINAL PROCEEDINGS TO WHICH THEY RELATE AND DO STIPULATE THAT THESE RESULTS ARE ADMISSIBLE EVIDENCE FOR OR AGAINST ME IN ANY SUCH CRIMINAL PROCEEDING.

"The State of Oregon by and through the District Attorney reciprocally stipulates that the above polygraph results may be received in evidence for or against HOWARD LYON in any future proceedings involving the parties."

Provision number 4, reading:

"I have a right to a court-appointed attorney to be paid from public funds if I am without funds;"

was crossed out, and the notation "Not charged with crime," was added.

admitting the polygraph evidence in this case: (1) That polygraph evidence should not be admissible even upon stipulation; (2) that even if polygraph evidence is held admissible pursuant to a proper stipulation, this stipulation fails because defense counsel did not join in it; and (3) that the stipulation is not enforceable because the parties entered into it before charges were filed against defendant. For the reasons set out below, we agree with defendant's first argument and hold that OEC 403 bars the introduction of polygraph test results in evidence even when the parties have stipulated to its admissibility.

The issue presented in this case is one of first impression in this court. However, an impressive body of precedent from other jurisdictions is available to aid us in our resolution of this issue. Though the available authority is almost unanimous in holding that polygraph results may not be introduced into evidence upon the motion of either party, the jurisdictions appear to be almost evenly split on the question of admissibility of polygraph evidence pursuant to the parties' stipulation.[2] The momentum does not discernibly favor either stance.

Those courts that admit polygraph evidence under stipulation typically rely upon one or the other of two basic rationales. A few courts maintain that the stipulation enhances the reliability of the polygraph by permitting the parties "to control * * * those variables deemed significant to fairness and reliability." *Corbett v. State,* 94 Nev 643, 646, 584 P2d 704 (1978). However, most courts that permit the introduction of polygraph results pursuant to stipulation hold that by entering into the stipulation the parties waive the right to

---

[2] Among the decisions permitting the introduction of stipulated polygraph results are *Wynn v. State,* 423 So2d 294 (Ala Crim App 1982); *State v. Valdez,* 91 Ariz 274, 371 P2d 894 (1962); *White v. State,* 269 Ind 479, 381 NE2d 481 (1978); *State v. Marti,* 290 NW2d 570 (Iowa 1980); *State v. Roach,* 223 Kan 732, 576 P2d 1082 (1978); *Corbett v. State,* 94 Nev 643, 584 P2d 704 (1978); *State v. Renfro,* 96 Wash 2d 902, 639 P2d 737 (1982); *Cullin v. State,* 565 P2d 445 (Wyo 1977).

Among those holding stipulated polygraph evidence inadmissible are *People v. Anderson,* 637 P2d 354 (Colo 1981); *People v. Baynes,* 88 Ill 2d 225, 58 Ill Dec 819, 430 NE2d 1070 (1981); *Conley v. Commonwealth,* 382 SW2d 865 (Ky 1964); *State v. Catanese,* 368 So2d 975 (La 1979); *Akonom v. State,* 40 Md App 676, 394 A2d 1213 (1978); *State v. Grier,* 307 NC 628, 300 SE2d 351 (1983); *Fulton v. State,* 541 P2d 871 (Okla Crim App 1975); *Romero v. State,* 493 SW2d 206 (Tex Crim App 1973); *State v. Dean,* 103 Wis 2d 228, 307 NW2d 628 (1981).

object or are estopped to object to the introduction of the proffered evidence.

> "We believe [the admissibility of stipulated polygraph evidence] derives not from the fact that the stipulation somehow imbues the evidence with reliability, * * * but from the fact that the parties are estopped, by their stipulated waiver of the right to object, from asserting the unacceptability of the evidence * * *."

*Wynn v. State,* 423 So2d 294, 299 (Ala Crim App 1982). *Accord, e.g., Alexander v. State,* 449 NE2d 1068 (Ind 1983); *State v. Marti,* 290 NW 570 (Iowa 1980); *State v. Lassley,* 218 Kan 758, 545 P2d 383 (1976); *State v. Renfro,* 96 Wash 2d 902, 639 P2d 737 (1982). This waiver argument is occasionally couched in terms of "fairness":

> "Basic is the element that the State is entitled to fair treatment as is the defendant. Since the accused would undoubtedly rely on the results, if positive, it would be unreasonable to allow him to defeat their introduction because the results were unfavorable."

*Cullin v. State,* 565 P2d 445, 457 (Wyo 1977). *Accord Corbett v. State, supra.*

We noted in *Brown* that the leading case on stipulations for the admission of polygraph evidence is *State v. Valdez,* 91 Ariz 274, 371 P2d 894 (1962). In *Valdez,* the defendant, his counsel and the county attorney had entered into a written stipulation to the admissibility of a lie detector test to which defendant agreed to submit himself. At defendant's trial on a charge of possession of narcotics, the trial court, over defendant's objection, permitted the polygraph operator to testify to the results of the examination. The Supreme Court of Arizona concluded that:

> "[a]lthough much remains to be done to perfect the lie-detector as a means of determining credibility we think it has been developed to a state in which its results are probative enough to warrant admission upon stipulation."

91 Ariz at 283.

The court held that "lie-detector evidence is admissible to corroborate other evidence of a defendant's participation in the crime charged" and, if the defendant testifies, "to corroborate or impeach his own testimony." *Id.* This

admissibility was conditioned upon the satisfaction of certain "qualifications":

"(1) That the county attorney, defendant and his counsel all sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state.

"(2) That notwithstanding the stipulation the admissibility of the test results is subject to the discretion of the trial judge, i.e. if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.

"(3) That if the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:

"a. the examiner's qualifications and training;

"b. the conditions under which the test was administered;

"c. the limitations of and possibilities for error in the technique of polygraphic interrogation; and

"d. at the discretion of the trial judge, any other matter deemed pertinent to the inquiry.

"(4) That if such evidence is admitted the trial judge should instruct the jury that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged but at most tends only to indicate that at the time of the examination defendant was not telling the truth. Further, the jury members should be instructed that it is for them to determine what corroborative weight and effect such testimony should be given."

*Id.* at 283-84. A number of courts have adopted the *Valdez* "qualifications" in whole or in part in concluding that polygraph results are admissible as evidence pursuant to the parties' stipulation. *E.g., Wynn v. State, supra; Corbett v. State, supra; State v. Renfro, supra. See also State v. Stanislawski,* 62 Wis 2d 228, 306 NW2d 8 (1974), *overruled in State v. Dean,* 103 Wis 2d 228, 307 NW2d 628 (1981). The imposition of these elaborate procedures and preconditions to admission appears to reflect judicial recognition that the volatile mixture of uncertain reliability and extreme persuasiveness represented by polygraph results must be handled gingerly, if at all.

At least two states that initially adopted the *Valdez* criteria later reversed field and held stipulated polygraph results inadmissible. *State v. Grier,* 307 NC 628, 300 SE2d 351 (1983), *overruling State v. Milano,* 297 NC 485, 256 SE2d 154 (1979); *State v. Dean,* 103 Wis 2d 228, 307 NW2d 628 (1981), *overruling State v. Stanislawski,* 62 Wis 2d 730, 216 NW2d 8 (1974). One state that initially adopted *Valdez* later wholly abandoned the requirement of a stipulation and now admits polygraph evidence upon either party's initiative subject only to foundational requirements of the polygraph operator's expertise, the reliability of the particular testing procedure used and the validity of the tests made on the subject. *State v. Dorsey,* 88 NM 184, 530 P2d 204 (1975), *overruling State v. Lucero,* 86 NM 686, 526 P2d 1091 (1974).

Those courts that reject the admissibility of stipulated polygraph evidence do so on the grounds (1) that the stipulation does not improve the reliability of the polygraph results, *e.g. Pulakis v. State,* 476 P2d 474 (Alaska 1970); *Fulton v. State,* 541 P2d 871 (Okla Crim App 1975); *Romero v. State,* 493 SW2d 206 (Tex Crim App 1973); (2) that juries are likely to be unduly persuaded by the polygraph evidence, *e.g. People v. Anderson,* 637 P2d 354 (Colo 1981); *State v. Grier,* 307 NC 628, 300 SE2d 351 (1983); (3) that the parties can stipulate to facts but cannot by stipulation change the law regarding the admissibility of polygraph evidence, and (4) that it is logically inconsistent to hold polygraph evidence inadmissible when one party seeks to introduce it but admissible by the parties' stipulation. Even commentators who champion the general admissibility of polygraph results question the basis in logic of admitting pursuant to stipulation evidence that it is otherwise inadmissible. Tarlow, *Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility in a Perjury-Plagued System,* 26 Hastings L J 917, 953-56 (1975).

A leading case on the exclusion of stipulated polygraph evidence is *Pulakis v. State,* 476 P2d 474 (Alaska 1970). The Alaska Supreme Court there reasoned:

> "The central problem regarding admissibility is, not that polygraph evidence has been proved unreliable, but that polygraph proponents have not yet developed persuasive data demonstrating its reliability. * * * On the basis of our study of the relevant literature, we are not prepared to say whether polygraph examiners' opinions are reliable. * * *.

"On the basis of our study of the judicial authority and academic literature in this area, we conclude that the results of polygraph examinations should not be received in evidence over objection. Even if no objection has been tendered, the trial court ordinarily should reject such evidence. A stipulation for admission does not increase the reliability of polygraph results and therefore should not lead to any deviation from the exclusionary policy."

476 P2d at 479.

We find particularly instructive the experiences of two states that recently ended prolonged experiments with the *Valdez* requirements and concluded that stipulated polygraph evidence is no longer admissible in evidence.

In 1974 the Supreme Court of Wisconsin adopted the *Valdez* criteria for admission of stipulated polygraph evidence in *State v. Stanislawski, supra.* Seven years later, in *State v. Dean, supra,* the court overruled *Stanislawski* and held inadmissible polygraph evidence submitted pursuant to stipulation. In an exhaustive opinion the court reviewed its experiences with the *Stanislawski* rule, then addressed anew the issue:

"* * * whether in theory and in application the four *Stanislawski* conditions which are designed to achieve the court's objectives of having the parties waive objection to the validity of the basic theory of polygraphs, of enhancing the reliability of the proffered polygraph evidence, and of ensuring the integrity of the trial justify admissibility of polygraph evidence."

103 Wis 2d at 265-66.

The court concluded that they did not, stating:

"We recognize today, as we did in *Stanislawski,* that the science and art of polygraphy have advanced and that the polygraph has a degree of validity and reliability. We are, nevertheless, not persuaded that the reliability of the polygraph is such as to permit unconditional admission of the evidence. Our analysis of and our experience with the *Stanislawski* rule lead us instead to conclude that the *Stanislawski* conditions are not operating satisfactorily to enhance the reliability of the polygraph evidence and to protect the integrity of the trial process as they were intended to do.

"The *Stanislawski* rule which appeared in 1974 to be a reasonable compromise between unconditional admission of and unconditional rejection of polygraph evidence does not appear at this time to be the satisfactory compromise, and we decline to continue to permit the admission of polygraph evidence pursuant to the rule set forth in *Stanislawski.*"

*Id.* at 278-79.

Two years after *Dean,* North Carolina joined Wisconsin in abandoning *Valdez.* In *State v. Grier,* 307 NC 628, 300 SE2d 351 (1983), the North Carolina Supreme Court ended its nine-year experiment with *Valdez* that had begun with *State v. Milano, supra.* The court emphasized, as the Wisconsin court had, that:

"[a]dmissibility of this evidence has not been based on the validity and accuracy of the lie detector, but rather that by consenting to the evidence pursuant to stipulation, the parties have waived any objections to the inherent unreliability of the test. The stipulation itself and the other conditions [to admissibility] were to operate as a compromise between total rejection and complete acceptance of polygraph evidence."

307 NC at 640. The court was "forced to conclude that the stipulation accomplishes little toward enhancing the reliability of the polygraph," and that subjecting admissibility to the discretion of the trial judge is not "a sufficient safeguard to ensure reliability of the polygraph test results in a particular case." *Id.* at 642. The court was "also disturbed by the possibility that the jury may be unduly persuaded by the polygraph evidence," and was not convinced that the cautionary instructions required by *Valdez* sufficiently meliorated this possibility. *Id.* at 643-44. The court concluded "that the admission by stipulation approach does not resolve some of the more perplexing problems attendant to the use of polygraph evidence," *id.* at 645, and that consequently "in North Carolina, polygraph evidence is no longer admissible in any trial." *Id.*

In *State v. Brown, supra,* we held that upon proper objection, polygraph test results are not admissible into evidence in any trial or other legal proceeding subject to the rules of the Oregon Evidence Code. We concluded that though "under proper conditions polygraph evidence may possess some probative value and may, in some cases, be helpful to the

trier of fact," 297 Or at 438, "the probative value of polygraph evidence is far outweighed by reasons for its exclusion." *Id.* at 440. We conclude that the stipulation of the parties does not cure these difficulties, and that these same considerations necessitate the exclusion of polygraph evidence even when the parties stipulate to its admission.

In determining whether we will admit polygraph evidence introduced pursuant to the parties' stipulation, we first consider the terms of the stipulation and what the stipulation purports to do. We note that certain items in the stipulation form are simply not proper subjects of stipulation. That defendant, having had the operation of the polygraph explained to him by the police, "believe[s] it to be a scientifically reliable instrument and * * * stipulate[s] that it is so reliable" is testament to the officer's powers of persuasion but is not binding upon the courts of this state. Like the Alaska Supreme Court in *Pulakis, supra,* at 479, we concluded in *Brown* that "no judgment of polygraph testing's validity or potential rate of error can be established based on available scientific evidence," 297 Or at 433. The parties' stipulation to the polygraph's reliability does not change this. Nor does defendant's "stipula[tion] that these results are admissible evidence" vitiate our pronouncement that "polygraph evidence shall not be admissible" over objection in Oregon's courts. 297 Or at 445.

The parties may stipulate to facts. Where the admissibility of an item of evidence is conditioned upon the satisfaction of certain foundational requirements, the parties may stipulate to the satisfaction of those requirements and will be bound by that stipulation. However, they may not by stipulation change the law to render admissible that which we have concluded is not admissible. As other courts have recognized, the "stipulation" to the admissibility of polygraph results constitutes the parties' mutual waiver of the right to object to the introduction into evidence of those results. The Washington Supreme Court, in the course of adopting the *Valdez* requirements, characterized such stipulations as follows:

> "When there is a stipulation as in this case, the prosecution and the defense, knowing that the degree of reliability is open to question, in effect gamble that the test will prove favorable to them."

*State v. Renfro,* 96 Wash 2d 902, 906, 639 P2d 737 (1982).

We have determined that we will not permit this gamble in Oregon's courts. Because of the importance of the institutional values implicated by the admission of polygraph results into evidence, we hold that we will not recognize a stipulation between the parties to the admissibility of polygraph evidence.

In *Brown* we were concerned with the "undue delay in administering justice that would occur if we were to allow the admission of polygraph evidence in all cases." 297 Or at 441. We are not convinced that the admission of the evidence pursuant to stipulation significantly reduces the risk of such delay. We are particularly concerned with consumption of time and potential confusion of issues resulting from challenges to the accuracy of the test. Even if the stipulation at issue were read as foreclosing challenges to the qualifications of the examiner and the reliability of the polygraph test, or the introduction of opposing test results, it cannot be argued that defendant would be foreclosed from challenging the manner in which his or her test was conducted, the form of the questions asked, or inquiring into any of the myriad factors that affect the accuracy of a particular test. We quoted the following passage from *United States v. Urquidez,* 356 F Supp 1363, 1367 (DC CD Cal 1973), with approval:

> "* * * [A]lthough the inquiry was far from complete, the experience of this case has amply shown that, as of now, the validity of a polygraphic test is dependent upon a large number of variable factors, many of which would be very difficult, and perhaps impossible, to assess. In a given case, *the time required in order to explore and seek to adjudicate such factors would be virtually incalculable* (we did little more than make a beginning in the present case). Accordingly, this court is impelled to the conclusion that the administration of justice simply cannot tolerate the burden of litigation inherently involved in such a process."

*Quoted in Brown,* 297 Or at 442 (emphasis added). Nor is it likely that a "stipulation" that would adequately address all these factors could be drafted or, if successfully drafted, withstand judicial scrutiny. The North Carolina Supreme Court, in overturning its own prior adoption of *Valdez* and holding stipulated polygraph evidence inadmissible, stated:

"The validity of the polygraphic process is dependent upon such a large number of variable factors, many of which are extremely difficult, if not impossible, to assess, that we feel the stipulation simply cannot adequately deal with all situations which might arise affecting the accuracy of any particular test."

*State v. Grier,* 307 NC 628, 645, 300 SE2d 351 (1983).

Of greater concern even than the possibility of undue delay is the potential for misuse and over-valuation of the polygraph evidence by the jury. We stated in *Brown:*

"Polygraph evidence may well divert the trier of fact from the direct and circumstantial evidence presented in a case to a distorted valuation of the polygraph evidence. Polygraph evidence is not just another form of scientific evidence presented by experts such as ballistics analysis, fingerprint and handwriting comparisons, blood typing and neutron activation analysis. These other tests do not purport to indicate with any degree of certainty that the witness was or was not credible. By its very nature the polygraph purports to measure truthfulness and deception, the very essence of the jury's role."

*Brown,* 297 Or at 440-41.

This is certainly no less true when the evidence is introduced pursuant to stipulation than when the evidence is introduced by one or other of the parties. In fact, that the parties stipulated to its introduction and to its "reliability" may only exacerbate the prejudicial impact of the polygraph evidence. Our primary considerations in reaching our conclusion in *Brown* were the probable effect of polygraph evidence upon the integrity of the trial process and our respect for the traditional role of the jury. *See also People v. Anderson, supra; People v. Baynes, supra; State v. Catanese,* 368 So2d 975 (La 1975); *Akonom v. State,* 40 Md App 676, 394 A2d 1213 (1978); *State v. Grier, supra; State v. Dean, supra.* The parties cannot by private agreement "waive" these vital institutional concerns.

A stipulation neither enhances the uncertain reliability of the polygraph examination nor blunts the prejudicial effect of polygraph results upon the jury. The same considerations that compelled us to conclude in *Brown* that polygraph results are inadmissible over the objection of either party compel us now to conclude that polygraph evidence is inadmissible

for any purpose in any legal proceeding subject to the rules of evidence under the Oregon Evidence Code, and henceforth its admission, pursuant even to the parties' stipulation, is error. On retrial, the court will exclude from evidence the proffered polygraph test results.

We agree with the Court of Appeals' analysis of defendant's challenge to the admission of his testimony before the grand jury, 83 Or App 601-03, and affirm on that point. Defendant's decision to testify was clearly voluntary and was not the result of any constitutionally proscribed police conduct. *See State v. Sparklin,* 296 Or 85, 672 P2d 1182 (1983). Admission of that testimony was not error.

The Court of Appeals remanded the case for a new trial because of the admission of inadmissible hearsay. We agree that the conviction should be reversed and the case remanded for the reasons stated by the Court of Appeals and for the additional reasons set forth above. The decision of the Court of Appeals is affirmed. The case is remanded to the trial court for a new trial.

**LINDE, J.,** concurring.

While I fully concur in the court's opinion, a few words may be added to ask whether there perhaps are wider reasons for the result.

This court, like others, has rejected the use of polygraph evidence on grounds that this means of attacking or supporting the truthfulness of a person's declarations is too unreliable, too prone to error and conscious or unconscious manipulation, to have evidentiary value. The court set forth the reasons for that conclusion in Justice Jones's extensive review of the literature on polygraphy in *State v. Brown,* 297 Or 404, 687 P2d 751 (1984). Today's decision is based on the same premises and conclusion.

These are reasons enough for the present case. Yet it seems worth raising a question whether more is involved in the widespread uneasiness about electrical lie detectors, reasons that are masked by the common law courts' characteristic professional emphasis on trial procedures and rules of evidence. In fact, the question whether more is involved than unreliability suggests itself in this case, because the holding

goes beyond normal procedures for excluding unreliable evidence over an opposing party's objection and instructs courts not to admit polygraph evidence even without objection or when the parties expressly stipulate to its admission. These are extraordinary strictures against questionable evidence.

I think more is involved. I doubt that the uneasiness about electrical lie detectors would disappear even if they were refined to place their accuracy beyond question. Indeed, I would not be surprised if such a development would only heighten the sense of unease and the search for plausible legal objections.

Published accounts, not of record here, report that submission to polygraph tests is widely demanded in public as well as in private employment, not without resentment by employees. It was not only a concern about inaccuracy that caused the current Secretary of State to protest White House plans to demand such tests in a drive to discover and to inhibit unauthorized disclosures of information.[1] In part, of course, the Secretary's protest and the resentment of many civil servants and private employees arise from the implication that their word may not be trusted; but trust, too, is not the ultimate issue.

There are many contexts in which one person — a lender, a reporter, or a careful police officer — does not take another's word about an important fact at face value without checking the credibility of the speaker and the believability of the information against other sources. The principle is familiar in the law governing warrants for a search or seizure. *See, e.g.,* ORS 133.545; *State v. Montigue,* 288 Or 359, 605 P2d 656 (1980). Sometimes a person will be required to undergo a physical examination that may contradict his verbal assertions (for instance, that he consumed no more than two beers), or without even obtaining or considering any verbal

---

[1] Secretary of State George Schultz protested a presidential authorization of random polygraph tests of federal officials who have access to confidential information, stating: "The minute in this government I am told that I'm not trusted is the day that I leave." New York Times, December 20, 1985, at A1 col. 6. Senator Sam Ervin, chairman of the United States Senate subcommittee on constitutional rights, in 1971 proposed outlawing polygraph testing of employees as a form of "20th Century witchcraft," citing many state statutes. 117 Cong Rec S21998 (Daily ed. June 24, 1971). *See, e.g.* ORS 659.225, 659.990.

statements from him. ORS 813.100 - 813.160. That, too, may be resented, but it is different from a polygraph examination.

What is that difference? The heart of the matter, I suspect, is that the polygraph seeks to turn the human body against the personality that inhabits it in a way that other tests do not.

The polygraph differs in principle from other physical examinations. Tests of one's breath, blood, or urine to detect the presence of illicit substances or a communicable disease may be perceived as an insult or an infringement of one's privacy. They also may prove one a liar. But even when employed to confirm or to contradict a verbal assertion, the immediate object of the test itself is to determine an independently relevant fact, the actual condition of the organism. Whether the tested person's stated belief is proved correct or erroneous is a secondary consequence, even when it is important.

The polygraph does not independently establish any past, present, or future fact. It purports neither to replace nor to supplement the assertions of the tested person with other evidence on the matter in question. The polygraph is indifferent to what the assertions are about and whether they are factually correct. As its popular name suggests, the lie detector only purports to detect whether a person is uttering a lie.

Beyond doubt that often is a useful thing to know. There is no general right to lie, as civil, criminal, and administrative sanctions in many contexts show, although it is interesting to recall that as late as the time of Oregon's statehood it was disputed whether a defendant could be sworn to the truth as well as permitted to address the jury, *see State v. Douglas,* 292 Or 516, 534, 641 P2d 561 (1982), (Lent, J. specially concurring), and knowingly false statements do not invariably forfeit the guarantees of free expression. Doubtless, also, it often is in one's interest to be able to overcome suspicion and "prove" one's truthfulness.

Legal systems have sought truthful testimony by various means. The solemn oath to speak the truth "so help me God" invoked religious obligation and fear for one's soul. Temporal punishment for perjury was added when conscience

or fear of damnation would not suffice. Both forms of admonition prompt the witness as a free agent to choose truth over falsehood and its consequences. The law also has experience with compelling disclosure by turning the human body against the human will. For five hundred years torture was a judicially administered instrument of criminal procedure to obtain confessions when reliable eyewitness testimony was lacking, because no conviction could rest only on inferences from circumstantial evidence. *See* Langbein, *Torture and Plea Bargaining,* 58 *The Public Interest* 43 (1980). Even without that legal rationale (and without its accompanying legal restraints), coercion of disclosures by pain remains a widespread though officially disavowed practice. Indefensible as it is, it still is addressed to human volition, as instances of failure to break the victim's resistance show. Coercion of the will by threat or by force confirms rather than denies traditional conceptions of personality.

Of course the polygraph is not torture, no more than an electrocardiogram, for instance. Also unlike torture, however, the polygraph is unconcerned with personal choice. Purporting only to detect lies, it is as indifferent to persuading the subject to tell the truth (though it may produce that effect) as it is to the substance of the questions asked and answered. The polygraph turns its subject into an object.

So do many diagnostic tests, as I have said. The same approach also may correspond to one theory of human behavior and human relationships. But is it consistent with the theory underlying our legal and social institutions? This seems doubtful. Inconsistency of physiological lie detection with fundamental tenets about human personhood has been important in European objections to the polygraph, reflecting Christian and Kantian philosophical traditions as much as doubts of its accuracy. *See, e.g.,* Silving, *Testing of the Unconscious in Criminal Cases,* 69 Harv L Rev 683 (1956), Westin, Privacy and Freedom 237-39 (1967).[2]

---

[2] The West German federal supreme court in 1954 held even consensual polygraph examination inconsistent with constitutional and statutory guarantees of personal dignity and free will. *See* Silving, *supra* at 688-93, Kaganiec, *Lie-Detector Tests and "Freedom of the Will" in Germany,* 51 NWU L Rev 446 (1956), reviewing the philosophical background. Professor Westin, at page 238, reports a 1958 papal condemnation of polygraphs as well as narco-analysis on moral grounds. *See generally* Richards, *Rights and Autonomy,* 92 Ethics 3 (1981).

The institution of the trial, above all, assumes the importance of human judgment in assessing the statements of disputing parties and other witnesses. The cherished courtroom drama of confrontation, oral testimony and cross-examination is designed to let a jury pass judgment on their truthfulness and on the accuracy of their testimony. The central myth of the trial is that truth can be discovered in no better way, though it has long been argued that the drama really serves symbolic values more important than reliable factfinding. *See, e.g.,* Arnold, The Symbols of Government 145 (1962). One of these implicit values surely is to see that parties and the witnesses are treated as persons to be believed or disbelieved by their peers rather than as electrochemical systems to be certified as truthful or mendacious by a machine.

What would be the effect if some such machine were proved 100 percent effective? It could be the ultimate 21st-Century refinement of the medieval Anglo-Saxon oath-helpers, who, of course, were only human.[3] A machine improved to detect uncertainty, faulty memory, or an overactive imagination would leave little need for live testimony and cross-examination before a human tribunal; an affidavit with the certificate of a polygraph operator attached would suffice. There would be no point to solemn oaths under threat of punishment for perjury if belief is placed not in the witness but in the machine.

Compulsion to take polygraph examinations would hardly be necessary; the present somewhat pathetic urge of previously unfaithworthy prisoners and suspects to prove their statements by volunteered polygraph tests would likely be emulated by other witnesses who want to be believed. Volunteered certificates of truthfulness could be expected to spread from legal procedures to employment, credit, and more personal relationships, and their absence thereafter would appear as grounds for suspicion. Would a perfect detector enhance people's capacity to test for truth only at the cost of diminishing their common humanity?

These questions go beyond doubts of the polygraph's

---

[3] Oath-helpers were persons who swore on oath that they believed the oaths of a party to a suit, thus helping to prove that the assertions made by that party were true. *See* Maitland, The Constitutional History of England 115-18 (1955).

accuracy. I do not speculate what legal issues beyond the rules of evidence they may raise; here none has been briefed. For the present case, I am satisfied to join in the court's opinion.